UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROC-A-FELLA RECORDS, INC.,

            PLAINTIFF,

  -AGAINST-

DAMON DASH,

            DEFENDANT.

Case No. **1:21-cv-5411**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Roc-A-Fella Records, Inc. ("RAF, Inc."), through its attorneys Quinn Emanuel Urquhart & Sullivan, LLP, for its Complaint against Defendant Damon Dash ("Dash"), alleges as follows:

<u>**NATURE OF THE CASE**</u>

1.      The clock is ticking.  Dash had planned to sell at a SuperFarm Foundation online auction on June 23, 2021, the copyright to Jay-Z's debut album *Reasonable Doubt*, recognized as one of the greatest recordings in history.  That auction was cancelled, and Dash is currently frantically scouting for another venue to make the sale.  It's not a matter of if, only when.  But Dash does not even own *Reasonable Doubt* or its copyright and, therefore, has no right to sell the album or any rights to it.  Instead, RAF, Inc. owns all rights to *Reasonable Doubt*.  The sale of this irreplaceable asset must be stopped before it is too late, and Dash must be held accountable for his theft.

2.      Shawn Carter, a/k/a Jay-Z ("Jay-Z"), Kareem Burke ("Burke"), and Dash each own one-third of the shares in RAF, Inc.  In 1995, RAF, Inc. and Jay-Z inked a record deal under which RAF, Inc. would own, among other things, "[t]he Masters and the LP, from the inception of the

recording thereof, and all Phonograph Records and other reproductions made therefrom, together with the performances embodied therein and all copyrights therein and thereto (excluding the copyright in the underlying compositions) throughout the world, and all renewals and extensions thereof . . . ." (*See* Ex. A § 4.01.)  The next year, pursuant to this agreement, Jay-Z released the album *Reasonable Doubt*.  The album was a huge success:  it is frequently lauded as the one of the greatest rap albums of all time, was certified platinum by the Record Industry Association of America, and has sold well over a million copies.  After several decades, RAF, Inc. remains the sole owner of the rights in *Reasonable Doubt*.

3.     During the past year, the market for non-fungible tokens, also called "NFTs," has exploded.  A non-fungible token is a unit of data that is "minted" and stored on a digital ledger, called a blockchain, that certifies a digital asset to be unique and therefore not interchangeable.  Simply put, it is a digit asset recorded on the blockchain that shows proof of ownership.  NFTs can be created to transfer ownership of virtually any asset—from visual art, to sporting event tickets, to copyrights.  NFTs can be freely bought and sold like any other asset, and some NFTs have traded for tens of millions of dollars.  SuperFarm owns an online platform that mints and sells NFTs to the public.

4.     Dash saw an opportunity in this emerging NFT market.  The rights to *Reasonable Doubt* are highly valuable and unique.  They can be used to create derivative works and generate significant financial and non-financial benefits.  There is only one *Reasonable Doubt*—the rights to it are irreplaceable.  Dash knew this and sought to cash in by auctioning the copyright to *Reasonable Doubt* as an NFT.  Though the original auction was cancelled, it is believed that Dash has already minted an NFT, which he intends to sell through another auction or some other means as soon as possible.

5.      But, again, Dash does not own *Reasonable Doubt* or the rights he is unlawfully seeking to sell.  And Dash's status a minority shareholder in RAF, Inc., gives him no right to sell a company asset.   A basic tenet of New York corporate law is that the corporation and its shareholders are distinct entities.   An individual shareholder, like Dash, does not own the corporation's assets—only the corporation does—and an individual shareholder cannot sell, transfer, or otherwise encumber a corporate asset.

6.      The bottom line is simple:  Dash can't sell what he doesn't own.  By attempting such a sale, Dash has converted a corporate asset and has breached his fiduciary duties.  His planned auction of *Reasonable Doubt* would result in irreparable harm.  The Court should stop Dash from attempting to sell the copyright to *Reasonable Doubt*, require Dash to return the NFT of *Reasonable Doubt* to RAF, Inc., and hold him accountable for this brazen theft of RAF, Inc.'s most prized asset.

## JURISDICTION AND VENUE

7.      The Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1).  The amount in controversy, exclusive of interests and costs, exceeds $75,000.  There is complete diversity of citizenship.  RAF, Inc. is a New York corporation with its principal place of business in New York City.  Upon information and belief, Dash is a citizen of California.

8.      The Court has personal jurisdiction over Dash because he has intentionally aimed his wrongful conduct at New York, causing harm to a New York corporation.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the property that is the subject of the action is situated in this District and because

a substantial part of the unlawful acts giving rise to these claims occurred and continues to occur in this District.

**PARTIES**

10.     Upon information and belief, Dash is a resident and citizen of California.

11.     RAF, Inc. is a New York corporation with its principal place of business in New York City.

**FACTUAL ALLEGATIONS**

**A.     JAY-Z'S RISE TO FAME**

12.     Everyone knows who Jay-Z is.  But that wasn't always the case.  It was only through exceptional vision, persistence, and hard work that Jay-Z has attained an extraordinary level of popularity and fame in the United States and around the world.

13.     Before Jay-Z achieved this success, when no one would give him a record contract, he got his start by selling CDs out of his car in the Brooklyn projects.  Jay-Z's career took off in 1996 when he released *Reasonable Doubt*, which solidified his standing in the industry and has now achieved preeminent status.  Its cover is recognized around the world:



14.     Jay-Z is now known as one of the most influential rappers of all time.  He has sold over 50 million albums and 75 million singles.  He has won 23 Grammy Awards—the most by a rapper—and he holds the record for the most *Billboard 200* Number 1 albums by a solo artist, with 14.  He has been ranked by *Billboard* and *Rolling Stone* as one of the 100 Greatest Artists of All Time.

15.     In 2017, Jay-Z became the first rapper to be honored into the Songwriters Hall of Fame, and in 2018, he received the commemorative "Salute to Industry Icons" award at the 60th Grammy Awards.  In 2021, he was inducted into the Rock and Roll Hall of Fame, becoming the first living solo rapper to be inducted.

16.     Beyond his career as a performing artist and songwriter, Jay-Z has attained significant success as a businessman.  In 1999, he founded the clothing retailer *Rocawear*, and in 2003, he founded the luxury sports bar chain *40/40 Club*.  Both have grown to become multi-million-dollar companies.  Based on this success, both in and out of the recording studio, Jay-Z has become one of the wealthiest Black Americans and the wealthiest American musician.

17.     Jay-Z also devotes a significant amount of his time to philanthropic work.  In 2003, Jay-Z, together with his mother, founded The Shawn Carter Foundation to assist students facing socio-economic hardships to get a college degree.  More recently, he donated significant amounts of money to persons arrested while protesting against police brutality, and in 2020, he donated $1 million, through The Shawn Carter Foundation, to combat the COVID-19 pandemic in New York.

18.     Jay-Z has invested substantial time, energy, money, and entrepreneurial effort to develop his considerable professional and commercial achievements and success, as well as to develop his popularity, fame, and prominence in the public eye.

**B.     OWNERSHIP OF *REASONABLE DOUBT***

19.     RAF, Inc. was incorporated in New York on January 8, 1996.

20.     Jay-Z, Burke, and Dash each own one-third of the shares in RAF, Inc.  The shares are not publicly traded.

21.     RAF, Inc. owns the copyright and all rights, title, and interests to and in *Reasonable Doubt*, including, without limitation, right to sell, record, reproduce, broadcast, transmit, exhibit, distribute, advertise, and exploit the album.

22.     Dash holds no individual ownership interest in *Reasonable Doubt*, including in its copyright.

**C.     DASH ATTEMPTS TO AUCTION HIS PURPORTED INTEREST IN THE COPYRIGHT TO *REASONABLE DOUBT*, A COMPANY ASSET**

23.     Dash is attempting to steal a company asset, mint it as an NFT, and auction it. Originally, he planned to use SuperFarm, an electronic platform that allows people to create, farm, buy, sell, auction, and swap NFTs.

24.     Dash's original illicit plan to auction his non-existent property interest in *Reasonable Doubt* is detailed in the SuperFarm auction announcement:

> SuperFarm is proud to announce, in collaboration with Damon Dash, the auction of Damon's ownership of the copyright to Jay-Z's first album Reasonable Doubt.  This marks a new milestone in the history of NFT's, entitling the new owner to future revenue generated by the unique asset.  The monumental event will last for two days starting on June 23 and concluding on June 25.  SuperFarm is excited to host this truly remarkable auction and immortalize one of the world's greatest artists on the blockchain!
>
> . . . .

6

Selling the copyright to Jay-Z's Reasonable Doubt as an NFT is a groundbreaking landmark—both for the crypto space and the broader music industry. The newly minted NFT will prove ownership of the album's copyright, transferring the rights to all future revenue generated by the album from Damon Dash to the auction winner.

The whole process will occur on-chain thanks to the magic of the Ethereum blockchain and SuperFarm's innovative blockchain technology. The significance of this NFT auction cannot be overstated as it will set a precedent for how artistically created value and its ownership can be proven, transferred, and monetized seamlessly through a public blockchain.

The NFT auction will kick off on June 23 on SuperFarm.com and last for two days . . . . SuperFarm is thrilled to take this major step and strengthen its place as a leading innovator in the blockchain space and the go-to NFT platform for creators, collectors, gamers, and investors.

(Ex. B at 1, 2.)

25.    The auction announcement also discusses Jay-Z's major accomplishments and touts the significance of *Reasonable Doubt* to entice bidders. (*Id.* at 1.)

26.    As the auction announcement makes clear, Dash represents that he owns—and is selling—the copyright and "rights to all future revenue generated by the album," which the press release admits is a "unique asset." (*Id.* at 1, 2.) But Dash merely owns a 1/3 equity interest in RAF, Inc.; he does not own the copyright—RAF, Inc. does—and therefore has no right to sell the copyright or any individual ownership interests in *Reasonable Doubt*.

27.    RAF, Inc.'s attorneys sent SuperFarm a letter explaining why the sale was improper and requesting that it cancel the auction. (*See* Ex. C.) RAF, Inc.'s attorneys sent a similar letter to Dash. (*See* Ex. D.) SuperFarm cancelled the auction. But Dash has refused to stop his efforts to sell RAF, Inc.'s most-prized asset and is currently in the process of finding another venue to consummate this improper transaction.

## FIRST CLAIM FOR RELIEF: DECLARATORY JUDGMENT

### (AGAINST DASH )

28.     RAF, Inc. repeats and incorporates the allegations above, as if fully set forth herein.

29.     RAF, Inc. owns all rights, title, and interests to and in *Reasonable Doubt*, including the copyright.

30.     Dash has no right to sell *Reasonable Doubt* or any copyrights in the album.  The corporation and its shareholders are distinct entities.  An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets.  Dash therefore holds no individual ownership interest in *Reasonable Doubt* that he can legally transfer as an NFT or otherwise.

31.     Dash is attempting to sell his purported ownership interest in the copyright to *Reasonable Doubt*.

32.     Pursuant to 28 U.S.C. § 2201(a), RAF, Inc. seeks a judgment from this Court declaring the following: (a) RAF, Inc. owns all the rights to *Reasonable Doubt*, including its copyright; (b) Dash, as a RAF, Inc. shareholder, has no direct ownership interest in *Reasonable Doubt*; (c) Dash is not permitted to sell any interest in *Reasonable Doubt*; and (d) Dash must transfer to RAF, Inc., any NFT or other asset in his possession, custody, or control reflecting rights to *Reasonable Doubt*.

## SECOND CLAIM FOR RELIEF: BREACH OF FIDUCIARY DUTY

### (AGAINST DASH)

33.     RAF, Inc. repeats and incorporates the allegations above, as if fully set forth herein.

34.     Shareholders in a close corporation owe fiduciary duties to one another and the company, including the duty of loyalty.  Accordingly, Dash owes a fiduciary duty of loyalty to RAF, Inc.

35.     The duty of loyalty requires that the best interests of the corporation and its shareholders take precedence over any interest possessed by an individual shareholder.

36.     Dash knowingly and intentionally breached his duty of loyalty by leveraging his position as a shareholder to attempt to steal and sell an asset of RAF, Inc. for his own personal benefit.

37.     RAF, Inc. has been damaged as a direct result of Dash's improper conduct.

### THIRD CLAIM FOR RELIEF: CONVERSION

### (AGAINST DASH)

38.     RAF, Inc. repeats and incorporates the allegations above, as if fully set forth herein.

39.     RAF, Inc. owns all property interests in *Reasonable Doubt*, including its copyright.

40.     Dash has stolen and claims that he owns the copyright to *Reasonable Doubt*.  But Dash knows that he has no individual ownership rights in *Reasonable Doubt*.

41.     Dash has exercised unauthorized dominion over RAF, Inc.'s property, in which RAF, Inc. has legal title and a superior right of possession.

42.     By stealing the copyright to *Reasonable Doubt*, minting it or planning to mint it as an NFT that he owns and offering the NFT for sale, Dash has acted to exclude RAF, Inc. and the other shareholders from the benefits of that asset.

43.     Dash has refused to stop his efforts to sell the copyright to *Reasonable Doubt* and return RAF, Inc.'s property, despite knowing that he has no individual ownership rights in it.

44.     Dash has converted *Reasonable Doubt* to his own use.

45.     RAF, Inc. has been damaged as a direct result of Dash's improper conduct.

### FOURTH CLAIM FOR RELIEF: REPLEVIN

### (AGAINST DASH)

46.     RAF, Inc. repeats and incorporates the allegations above, as if fully set forth herein.

47.     RAF, Inc. owns all property interests in *Reasonable Doubt*, including its copyright, and has the right to possess those interests.

48.     Dash has stolen and claims that he owns the copyright to *Reasonable Doubt*.  But Dash knows that he has no individual ownership rights in *Reasonable Doubt* and that he is in unauthorized possession of assets reflecting ownership of the copyright.

49.     RAF, Inc. has demanded that Dash return the property, including any NFTs or anything else reflecting ownership of *Reasonable Doubt*.  He has refused.

50.     Dash is therefore in unlawful and wrongful possession of RAF, Inc.'s property.

51.     RAF, Inc. has a possessory right in the property that is superior to Dash's interest, which is non-existent, and is entitled to immediate possession of the property.

52.     RAF, Inc. has been damaged as a direct result of Dash's improper conduct.

### FIFTH CLAIM FOR RELIEF: UNJUST ENRICHMENT

### (AGAINST DASH )

53.     RAF, Inc. repeats and incorporates the allegations above, as if fully set forth herein.

54.     If Dash auctions or otherwise sells the *Reasonable Doubt* copyright or any rights to *Reasonable Doubt*, he would be enriched at RAF Inc.'s expense.

55.     It is against equity and good conscience for him to retain the proceeds from such a sale because he does not own the copyright or rights to *Reasonable Doubt*.

56.     RAF, Inc. has been or will imminently be damaged as a direct result of Dash's improper conduct.

## PRAYER FOR RELIEF

WHEREFORE, RAF, Inc. demands judgment as follows:

- Enjoining Dash from selling any interest in *Reasonable Doubt*;

- Awarding RAF, Inc. general and/or compensatory damages in an amount to be determined at trial for all injuries suffered as a result of Dash's wrongdoing;

- Entering a judgment declaring the following: (a) RAF, Inc. owns all the rights to *Reasonable Doubt*, including its copyright; (b) Dash, as a RAF, Inc. shareholder, has no direct ownership interest in *Reasonable Doubt*; (c) Dash is not permitted to sell any interest in *Reasonable Doubt*; and (d) Dash must transfer to RAF, Inc., any NFT or other asset in his possession, custody, or control reflecting rights to *Reasonable Doubt*;

- Awarding RAF, Inc. nominal damages;

- Awarding RAF, Inc. punitive damages;

- Awarding RAF, Inc. pre-judgment and post-judgment interest at the maximum rate allowable by law;

- Awarding RAF, Inc. the cost of suit as incurred in this action and attorneys' fees; and

- Awarding RAF, Inc. all other relief as may be appropriate.

## JURY TRIAL DEMAND

RAF, Inc. hereby demands a trial by jury of all issues so triable.


Dated: June 18, 2021
New York, New York

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: */s/ Alex Spiro*
Alex Spiro
Luke Nikas
Paul B. Maslo
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
alexspiro@quinnemanuel.com
lukenikas@quinnemanuel.com
paulmaslo@quinnemanuel.com

*Attorneys for RAF, Inc.*

# EXHIBIT A

Roc-A-Fella Records, Inc.
17 John Street, Suite 1400
New York, New York 10038

Dated:   October 1, 1995

Shawn Carter p/k/a "Jay-Z"
c/o John Meneilly
Provident Financial Management
152 West 57th Street, 19th Floor
New York, New York  10019

Dear Shawn:

The following shall constitute the agreement (the "Agreement") between Roc-A-Fella Records, Inc. ("Company" and/or "we") and Shawn Carter, professionally known as "Jay-Z" ("Artist" or "you"), with respect to the distribution of those certain master recordings (the "Masters") embodying the performances of Artist, which such Masters are intended to be initially embodied on one (1) long-playing phonorecord (the "LP"). For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby agree as follows:

1.        TERM.

1.01   (a)      The term of this Agreement (the "Term") shall commence on the date hereof and continue for a period (the "Period") ending ten (10) months following Company's initial release of the LP delivered during the Period.

(b)      All references to the Term of this Agreement shall refer to the Period.  During the Term of this Agreement, Artist agrees not to record master recordings for any third parties.

2.        RECORDING COSTS/PRODUCTION COSTS.

2.01   Company shall pay Artist all recording costs set forth in the approved recording budget ("Recording Costs").  Artist shall submit a recording budget to Company, which Company shall have the right to approve in Company's reasonable discretion.  Once approved, Company shall pay all Recording costs in connection with the recording of the LP.  Artist shall be responsible for the payment of all Recording Costs or other costs in connection with making Masters which costs have not been specifically approved in writing by Company.  One hundred percent (100%) of the Recording Costs shall be recoupable from any monies (excluding mechanical royalties) payable by Company to Artist.

1

3.        DELIVERY

3.01    Artist shall deliver the Masters comprising the LP to Company.  The Masters shall be technically and commercially satisfactory.

4.        RIGHTS IN RECORDINGS.

4.01    As between Artist and Company all Masters embodied on the LP and all Masters recorded hereunder, from the inception of the recording thereof, shall, for purposes of copyright law, be deemed "works made for hire" for us by you and all other persons rendering services in connection with those Masters are our employees for hire.  The Masters and the LP, from the inception of the recording thereof, and all Phonograph Records and other reproductions made therefrom, together with the performances embodied therein and all copyrights therein and thereto (excluding the copyright in the underlying compositions) throughout the world, and all renewals and extensions thereof, shall be entirely our property, free of any claims whatsoever by you, or any other person, firm, or corporation.  We shall, accordingly, have the exclusive right to obtain registration of copyright (and all renewals and extensions) in those Masters and the LP, in our name, as the owner and author thereof.  If we shall be deemed not to be the author of those Masters and/or the LP, this Agreement shall constitute an irrevocable transfer to us of ownership of copyright (and all renewals and extensions) in those Masters and/or the LP.  You shall, upon our request, cause to be executed and delivered to us transfers of ownership of copyright (and all renewals and extensions) in those Masters and any other documents as we may deem necessary or appropriate to vest in us the rights granted to us in this Agreement, and you hereby irrevocably appoint us your attorney-in-fact for the purpose of executing those transfers of ownership and other documents in your name.

5.        NAME AND LIKENESS.

5.01    We and any person, firm or corporation designated by us shall have the perpetual, worldwide right to use and to permit others to use your name (both legal and professional), approved likeness, and approved biographical material concerning you for purposes of trade, promotion and advertising in connection with the LP and/or the Masters.

5.02    You shall cooperate with us, as we reasonably request, in taking photographs and preparing other materials for use in promoting and publicizing you, the LP and the Masters.

6.        ROYALTIES.

Company shall accrue to the account of Artist the following royalties for the sale

2

of Phonograph Records derived from the Masters hereunder provided, however, no royalties shall be due and payable to Artist until such time as all Recording Costs, and any and all other costs incurred by Company in connection with Phonograph Records manufactured from the Masters recorded hereunder, have been recouped by or repaid to Company:

6.01   (a)   A royalty of fourteen percent (14%) of the Royalty Base for Net Sales of all LPs sold by Company for distribution through normal retail distribution channels in the United States;

(b)   A royalty of ten and one-half percent (10.5%) of the Royalty Base for Net Sales of all Singles sold by Company for distribution through normal retail distribution channels in the United States.

6.02   (a)   The royalty rate with respect to Net Sales of Phonograph Records sold by Company for distribution in Canada shall be eighty percent (80%) of the otherwise applicable basic royalty rate set forth in paragraph 6.01 hereof.

(b)   The royalty rate with respect to Net Sales of Phonograph Records sold by Company for distribution in the rest of the world (i.e., those countries other than those set forth in paragraph 6.02(d) below, shall be seventy-five percent (75%) of the otherwise applicable basic royalty rate set forth in paragraph 6.01 hereof.

(c)   In respect of sales outside of the United States and Canada by any of Company's licensees, the royalty to be accrued hereunder shall in no event exceed fifty percent (50%) of the net royalties received by Company from any such licensee in respect of such sales.

(d)   In respect of sales (if any) in Albania, Bulgaria, the Czech Republic, Slovakia, Hungary, Poland, Rumania, the countries formerly known as the Soviet Union, the countries formerly known as Yugoslavia ("Eastern Europe"), all countries on the continent of Africa, and all countries in Asia and Southeast Asia (except Japan), Company shall pay Artist fifty percent (50%) of its hard currency receipts actually received in the United States by Company from such sales, less any costs of collection of such receipts; provided that in no event shall such payment to Artist exceed the royalty which would otherwise have been payable but for the provisions of this paragraph 6.01(d).

6.03   (a)   Notwithstanding anything to the contrary expressed or implied herein, with respect to Net Sales of Phonograph Records sold in the form of compact discs, the royalty rate shall be eighty-five percent (85%) of the otherwise applicable royalty rate set forth in paragraph 6.01.

3

(b)     With respect to Net Sales of Phonograph Records sold in the form of Record configurations not specifically provided for herein, Company shall have the option to accrue, at its sole discretion, with respect to each such Record, either a royalty equal to the same dollars-and-cents (or other currency) royalty amount as would otherwise be accrued hereunder with respect to an equivalent Record in the form of an analog cassette, or a royalty computed at the same percentage of the Royalty Base of other LP configurations as the percentage of the Royalty Base utilized to compute the royalty for an equivalent LP in the form of an analog cassette.  For purposes of this paragraph only, the term "configurations not specifically provided for herein" means configurations other than vinyl disc, analog cassette, compact disc, Audio-visual devices and compact disc interactive.

6.04    Notwithstanding anything to the contrary anywhere in this Agreement, no royalties shall be payable on Phonograph Records furnished as "bonus" or "promotional" Records (as those terms are commonly defined in the music industry) including, but not limited to, Records sold through record clubs or direct mail distribution, Records distributed for promotional purposes to radio stations, television stations or networks, record reviews or other customary recipients of promotional Records, Records sold as "scrap" or "cut-outs", Records distributed as "free goods," and Records sold for less than fifty percent (50%) of their regular wholesale price to distributors, subdistributors, dealers or others, whether or not the recipients are affiliated with Company.

7.      ACCOUNTINGS

7.01    Accountings as to royalties accruing or which otherwise would have accrued hereunder shall be made by Company to Artist on or before September 30th for the period ending the preceding June 30th, and on or before March 31st for the period ending the preceding December 31st, or such other accounting periods as Company may in general adopt, but in no case less frequently than semi-annually, together with payment of accrued royalties, if any, earned by Artist during such preceding half-year, less Recording Costs or other recoupable and/or deductible amounts hereunder.  Company shall have the right to hold reasonable reserves in respect of sales hereunder.

7.02    Royalties in connection with the exploitation of Master Recordings hereunder shall be computed in the same national currency as Company is accounted to by its licensees and shall be paid at the same rate of exchange as Company is paid, and shall be subject to any taxes applicable to royalties remitted by or received from foreign sources, provided, however, that royalties on Records sold outside the United States shall not be due and payable by Company until payment therefor has been received by Company in the United States.  If Company shall not receive payment in the United States, or in United States Dollars, and shall be required to accept payment

4

in a foreign country or in foreign currency, Company shall deposit to the credit of Artist (at Artist's request and expense), in such currency in a depository in the country in which Company is required to accept payment. Deposit as aforesaid shall fulfill obligations of Company as to Record sales to which such royalty payments are applicable. If any law, government ruling or any other restriction affects the amount of the payments which Company's licensee can remit to Company, Company may deduct from Artist's royalties an amount proportionate to the reduction in such licensee's remittances to Company.

8.    MECHANICAL COPYRIGHT LICENSES.

8.01    (a)    The compositions recorded hereunder which are written, owned or controlled, in whole or in part, by you ("Controlled Compositions") are hereby licensed to Company for the United States at a rate (the "Controlled Composition Rate") equal to seventy five percent (75%) of the minimum statutory copyright royalty rate, determined as of the date the Masters were initially recorded; and for Canada at a rate equal to one seventy five percent (75%) of the minimum compulsory rate in Canada (or if there is no such rate, then three-fourths [3/4] of the lowest rate prevailing in Canada on a general basis) determined as of the date the Masters were initially recorded. Mechanical royalties shall only be payable on records for which royalties are payable hereunder. The mechanical royalty rate for a Controlled Composition contained in any budget or mid-priced record, long-play single, or extended play ("EP") record shall be three-fourths (3/4) of the Controlled Composition Rate.

(b)    Notwithstanding the foregoing, the maximum rate which Company shall be required to pay in respect of: (i) an album shall be equal to twelve (12) times the Controlled Composition Rate; (ii) an EP shall be equal to three (3) times the Controlled Composition Rate; and (iii) a single or long play single shall be equal to two (2) times the Controlled Composition Rate. If any record released by Company contains more than one version or arrangement of the same Controlled Composition, Company shall not be obligated to pay more than one (1) time the above rate in respect of such Controlled Composition on such record. Without limiting Company's rights, if the aggregate mechanical royalty rate for any record exceeds the rate provided for herein, such excess may be deducted from any and all sums due you hereunder.

(c)    If any compositions are recorded which are not Controlled Compositions, you warrant and represent that Company shall be able to obtain mechanical licenses therefor for the United States at rates and on terms no less favorable to Company than those contained in the then-current standard license form then being utilized by The Harry Fox Agency, Inc.

(d)    Company is hereby granted a royalty-free license to reproduce Controlled Compositions which are embodied on Masters produced hereunder in

5

synchronization with and in time relation to visual images featuring Artist's performances in so-called "video programs".

9.        AUDIO-VISUAL RECORDINGS.

9.01    Upon Company's and Artist's mutual decision, you shall appear for the making of Audio-Visual Recordings embodying your performances ("Videos"). Company shall determine a budget for such Videos after consultation with Artist.  One hundred percent (100%) of the costs of producing any such Videos shall be recoupable out of any and all monies payable to you (excluding mechanical royalties) under this Agreement except that only fifty (50%) percent of such costs shall be recoupable from record royalties payable to you.

9.02    Company and Artist shall have mutual production and creative control over all elements of any Videos produced hereunder or under the Distribution Agreement.

9.03    Company shall have full ownership and copyright in the Videos and Artist hereby acknowledges that the Videos hereunder are created as a work-for-hire for Company, and that for the purposes of making the Videos, Artist and all persons rendering services in connection with such Videos are Company's employees for hire.

10.        ARTWORK.

10.01  Company shall own the copyrights and all other rights in and to all artwork used in packaging records hereunder.

10.02  Artist shall have the right to approve all artwork created in connection with the release of the LP hereunder.  Artist shall have the right to submit artwork to Company, which Company will have the right to approve, provided such approval is not unreasonably withheld.  In the event Artist submits artwork to Company, Artist warrants and represents that said artwork shall not infringe on the right of any third parties, and Artist shall indemnify Company from and against any claims in connection with said artwork.

11.        TOUR SUPPORT/MARKETING/PROMOTION.

11.01  Company shall advance to Artist monies in a sum to be mutually approved by both parties in connection with Artist's touring or live performance activities.  One hundred percent (100%) of such monies shall be recoupable from and out of any and all monies (excluding mechanical royalties) payable to you under this Agreement.

11.02  In the event Company spends any monies on independent marketing or

6

promotion in connection with any of the Masters delivered to Company hereunder, which Company shall in no way be obligated to do, fifty percent (50%) of such monies shall be recoupable from and out of any and all monies payable to you under this Agreement.

12.    WARRANTIES, REPRESENTATIONS, RESTRICTIONS, INDEMNITIES.

12.01 You warrant and represent the following:

(a)    You are authorized, empowered and able to enter into and fully perform your obligations under this agreement. Neither this agreement nor the fulfillment thereof by any party infringes upon the right of any person. You own and control, without any limitations, restrictions or encumbrances whatsoever, all rights granted or purported to be granted to Company hereunder, and Artist has obtained all necessary licenses and permissions as may be required for the full and unlimited exercise and enjoyment by Company of all of the rights granted and purported to be granted to Company herein. Company will own, possess and enjoy such rights without any hindrance on the part of any person, firm or entity whatsoever.

(b)    You have no knowledge of any claim or purported claim which would interfere with Company's rights hereunder or create any liability on the part of Company.

12.02 During the Term you shall not enter into any agreement which would interfere with the full and prompt performance of your obligations hereunder, and you shall not perform or render any services for the purpose of making, promoting or marketing Phonograph Records or Master Recordings for any person other than us. You shall not re-record any compositions recorded on Masters embodied on the LP hereunder for a period of three (3) years after the end of the Term of this Agreement without first procuring Company's written approval, which Company may withhold in its sole discretion. Artist will not permit the use by any person other than Company of Artist's name or likeness for or in connection with the recording or exploitation of any Phonograph Record and/or audio-visual device embodying any Composition recorded by Artist during the Term of this Agreement.

12.03 During the Term you shall not render any musical performance (audio-visual or otherwise) for the purpose of making any motion picture or video tape (or any other means of audio-visual reproduction) ("Picture") for any Person other than us, and no Person other than us shall be authorized to produce, distribute, exhibit or otherwise exploit any Picture which contains any musical performance (audio-visual or otherwise) by you, without our express written consent.

12.04 You expressly acknowledge that your services hereunder are of a special,

7

unique, intellectual, and extraordinary character which gives them peculiar value, and that in the event a breach or threatened breach by you of any term hereof, we will be caused irreparable injury which cannot adequately be compensated by money damages.  Accordingly, we shall be entitled to seek injunctive relief, in addition to any other rights or remedies which we may have, to enforce the terms of this Agreement.

13.          DEFINITIONS.

13.01  "Album" or "LP" - a 12-inch, 33-1/3 rpm Record embodying thereon not fewer than ten (10) Sides and having not less than thirty-five minutes playing time.

13.02  "Composition" and "Musical Composition" - a musical composition or medley consisting of words and/or music, or any dramatic material, whether in the form of instrumental and/or vocal music, prose or otherwise, irrespective of length.

13.03  "Controlled Composition" - a composition or that part thereof, written, owned or controlled, directly or indirectly, by you and/or any person or entity associated or affiliated with you or in which you have a direct or indirect interest.

13.04  "Master Recording" - every recording of sound, whether or not coupled with a visual image by any method and on any substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of Phonograph Records.

13.05  "Master" - a Master Recording embodying your performances recorded hereunder and/or produced in whole or in part by you hereunder.

13.06  "Mechanical Royalties" - royalties payable to any person for the right to reproduce and distribute copyrighted Musical Compositions on Phonograph Records.

13.07  "Side": - A Recording of sufficient playing time to constitute one (1) side of a 7 inch, 45 rpm disc Phonograph Record, but not less than two and one-half (2-1/2) minutes of continuous sound, embodying performances of Artist.

13.08  "Records," "Phonograph Records": Any device now or hereafter known, on or by which sound may be recorded and reproduced, which is manufactured or distributed primarily for home and/or consumer and/or juke box use and/or use on or in means of transportation including "sight and sound" devices or audio-visual devices.

13.09  "Single": A 7 inch, 45 rpm Phonograph Record or equivalent embodying thereon at least one (1) Side, and expressly including a compact disc or pre-recorded tape embodying the same two (2) Sides on each of side "A" and side "B".

8

13.10 "Base Price":

(a)    With respect to Records other than audio-visual devices and compact discs, the Base Price is the "Retail List Price," defined as Company's suggested retail list price (or the equivalent price category) in the United States for records sold in the United States, and, with respect to Records sold outside the United States, an equivalent of or substitute for an actual or hypothetical retail price ("Retail-related Base") as may be established by Company or its licensee(s) in conformity with the general practice of the Record industry in such country, or otherwise, provided that Company may but shall not be obligated to utilize the price adopted by the local mechanical copyright collection agency as the basis for the collection of mechanical copyright royalties.  Notwithstanding anything to the contrary expressed or implied in the preceding sentence, it is understood and agreed that if a Retail-related Base cannot be established in a particular country, the Base Price shall be that amount equal to the lowest wholesale price payable by the largest category of Company's customers in the normal course of business with respect to such Records sold for distribution during the applicable semi-annual accounting period, multiplied by one hundred twenty-six percent (126%), provided however, that if a published price to dealers ("ppd") exists in the applicable country of sale then Company may apply the ppd in lieu of the lowest wholesale price.

(b)    With respect to Records in the form of compact discs sold for distribution in the United States, the Base Price shall be that amount equal to the lesser of (i) the suggested retail list price in the United States for Records in the form of compact discs, provided such suggested retail list price exists, or (ii) the lowest wholesale price payable by the largest category of Company's customers in the normal course of business with respect to compact discs embodying such Records sold for distribution during the applicable semi-annual accounting period, multiplied by one hundred and thirty percent (130%).  With respect to compact discs sold for distribution outside the United States, the Base Price shall be that amount equal to the lesser of (i) the suggested retail list price in the applicable country for Records in the form of compact discs, provided such suggested retail list price exists, or (ii) the lowest wholesale price payable by the largest category of Company's customers in the normal course of business with respect to compact discs embodying such Records sold for distribution during the applicable semi-annual accounting period, multiplied by one hundred twenty-six percent (126%), provided however, that if a published price to dealers ("ppd") exists in the applicable country of sale then Company may apply the ppd in lieu of the lowest wholesale price.

13.11 "Royalty Base":  The Base Price less all excise, sales and similar taxes if included in the Base Price and less the applicable Container Charges, if any.

13.12 "Container Charge":  Twelve and one-half percent (12-1/2%) of the Base

9

Price for a single-fold disc Album in a standard sleeve with no inserts or for a disc Single; fifteen percent (15%) of the Base Price for a disc Album in a double fold jacket or non-standard sleeve or jacket or with inserts; twenty percent (20%) of the Base Price for a pre-recorded analog tape and twenty-five percent (25%) of the Base Price for compact discs or for any other Record.

13.13  "Recording Costs":  All costs including preproduction and post-production costs incurred for and with respect to the production of Master Recordings.  Recording Costs include without limitation, union scale; payments for musicians, vocalists, conductors, arrangers, orchestrators, copyists, etc.; payments required by an agreement between Company and any labor organization; producer's fees; studio charges; costs of tape, editing, mixing, mastering to tape, reference discs and engineering; expenses of travel, per diems and rehearsal halls; costs of non-studio facilities and equipment; dubbing; costs and transportation of instruments including cartage and rental fees; and other costs and expenses incurred in producing Master Recordings and other costs which are customarily recognized as recording costs in the Phonograph Record industry.

13.14  "Net Sales":  Sales of Records hereunder, paid for, less returns and credits.

14.      ASSIGNMENT.

14.01  We shall have the right, at our election, to assign any of our rights hereunder, in whole or in part, to any person, firm, or corporation.  You shall not have the right to assign any your rights hereunder.  No purported assignment in violation of this restriction shall be valid to pass any interest to the assignee.

15.      SUSPENSION.

15.01  The running of the Term and Company's obligations under this Agreements shall be automatically suspended if for any reason whatsoever Artist refuses, neglects, fails or becomes unable to fulfill any of Artist's obligations hereunder, or if as a result of an act of God, accident, fire, labor controversy, riot, civil commotion, act of a public enemy, law, enactment, rule, order, or act of any government or governmental instrumentality, failure of technical facilities, failure or delay of transportation facilities, illness or incapacity of Artist or others, or other cause of a similar or dissimilar nature not reasonably within our control, Company or Distributor is hampered in the recording, manufacture, distribution or sale of phonograph records, or Company's or Distributor's normal business operations become commercially impractical.  Such suspension shall be for the duration of any such event or contingency, and unless Company notifies Artist to the contrary in writing, the Period shall be automatically extended by a number of days equal to the total number of days

10

of the suspension.

15.02  If Artist refuses, neglects, fails or is unable to fulfill any of Artist's obligations under this Agreement, including, without limitation, Artist's obligation to record and deliver to Company Masters within the time period set forth in this Agreement, Company may (but with respect to Artist's failure as opposed to refusal to deliver an LP hereunder, only under written notice to Artist and Artist's failure to deliver such LP within thirty (30) days from the date of such written notice), without limiting Company's other rights or remedies, terminate the Term upon written notice to Artist, in which event Company shall have no obligations or liabilities to Artist under this Agreement, except for Company's obligations with respect to Masters recorded prior to that termination.  If Company so terminates the Term, Artist shall pay us an amount equal to any unrecouped balances hereunder, other than any portion thereof specifically attributable to recording costs.

16.        INDEMNITY.

16.01  You hereby indemnify, save, and hold us, our successors and assigns, and our parent and affiliated companies and our and their respective officers, employees and agents, harmless from and against any and all liability, claims, demands, loss, costs, expenses and damage (including attorneys' fees and court costs), arising out of or in any way connected with any actual or threatened claim, demand, or action by us or by a third party which is inconsistent with any of the warranties, representations, or agreements made by you in this Agreement and you shall promptly reimburse us, on demand, for any loss, expense, cost, damage, or liability to which such indemnity applies.  If you shall fail to pay the same to us, we may deem all such monies as an advance against any monies payable to you under this Agreement or under any other agreement between you and us or our affiliates.  Pending the determination of any claim, demand or action, we may, at our election, withhold any and all monies payable to you hereunder, or under any other agreement between you and us or our affiliates, sufficient, in our opinion, to reimburse us for any contemplated damages, including court costs and attorneys' fees and costs resulting therefrom.

17.        MISCELLANEOUS.

17.01  This Agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and cannot be changed or terminated except by an instrument signed by both parties.  A waiver by either of us of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof.

17.02  If any provision of this Agreement shall be held void, voidable, invalid, or

11

inoperative, no other provision of this Agreement shall be affected as a result thereof, and, accordingly, the remaining provisions of this Agreement shall remain in full force and effect as though such void, voidable, invalid, or inoperative provision had not been contained herein.

17.03  Neither party hereto shall not be deemed to be in breach of any of its curable obligations hereunder unless and until within ten (10) days after said party acquires knowledge of any such breach or facts sufficient to put the other party on notice of any such breach, the non-breaching party shall have given the allegedly breaching party specific written notice by certified or registered mail, return receipt requested, describing in detail the breach and the allegedly breaching party shall have failed to materially commence to cure that breach within thirty (30) days after receipt of that written notice.

17.04  This Agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of said state applicable to contracts entered into and performed entirely therein, with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance, or breach of this Agreement.  Any process in any action or proceeding commenced in the courts of said state or elsewhere arising out of any such claim, dispute or disagreement, may among other methods, be served upon you by delivering or mailing the same, via registered or certified mail, addressed to you at the address first above written or such other address as you may designate pursuant to article 20 hereof.  Any such delivery or mail service shall be deemed to have the same force and effect as personal service within said state or the jurisdiction in which such action or proceeding may be commenced.

18.      NOTICES.

18.01  All notices which Company or Artist may be required to give to one another under this Agreement shall be served at the addresses first listed above by depositing same, certified or registered mail, return receipt requested in any mailbox, chute or other receptacle authorized by the U.S. Post Office for mail addressed to the relevant party at the addresses set forth below, or at such other addresses as Company or Artist may from time to time designate in writing to each other.

19.      INDEPENDENT COUNSEL:

19.01  Artist expressly acknowledges and agrees that Artist has been advised to seek independent legal counsel with regard to this Agreement, and that Artist has been give a sufficient amount of time and opportunity to so do, and that any failure to seek said independent counsel was at Artist's sole discretion.

12

IN WITNESS WHEREOF the parties have executed this Agreement as of the date first hereinabove set forth.

By: _____
Shawn Carter p/k/a "Jay-Z"

AGREED AND ACCEPTED:

ROC-A-FELLA RECORDS, INC.

By: _____
Authorized Signatory

Its:_____

13

# EXHIBIT B

*Reasonable Doubt* was in fact Jay-Z's first album, created without any major labels or record deal in 1995 – and sold out of his car. It was only a year later when he found a distribution partner, that the album was catapulted straight to number 23 on the United States' Billboard 200. In 2012, *Reasonable Doubt* was featured in *Rolling Stone's 500 Greatest Albums of All Time* and it easily achieved platinum status industry.

# SuperFarm Announces NFT Auction for Jay-Z's Iconic Album *Reasonable Doubt*

graphic

SuperFarm is proud to announce, in collaboration with Damon Dash, the auction of Damon's ownership of the copyright to Jay-Z's first album *Reasonable Doubt*. This marks a new milestone in the history of NFT's, entitling the new owner to future revenue generated by the unique asset.

The monumental event will last for two days starting on June 23 and concluding on June 25. SuperFarm is excited to host this truly remarkable auction and immortalize one of the world's greatest artists on the blockchain!

## Jay-Z: Hip Hop Icon & Business Mastermind

The world of music wouldn't be the same without the ingenious innovator and business mastermind Jay-Z. His music and business endeavors have not just shaped the world of rap and hip hop but the universal music culture of today.

Jay-Z is famed for being one of the best lyricists, bringing his creative talent not just to his own music but also to the work of famous artists such as Beyoncé and Dr. Dre.

Having sold over 50 million albums and 75 million singles worldwide, Jay-Z is one of the most popular and best-selling musicians of all time. Jay-Z is not just the rapper with the most Grammy Awards – 23 in total – but he also holds the record for the most number-one albums by a solo artist.

Having a musical catalog worth approximately $100 million, Jay-Z has made more money from his music than most other living artists. The fact that his net worth is estimated to be over $1.4 billion shows that Jay-Z is not just a highly influential artist but an equally successful business person.

## *Reasonable Doubt* – Jay-Z's Masterpiece

Jay-Z's remarkably versatile track record is full of highlights. However, his first album *Reasonable Doubt* is certainly at the forefront when it comes to success and significance, as it established Jay as the premier freestyle rapper of his generation. Jay-Z even called *Reasonable Doubt* his "baby" and the "best album that was ever made".

*Reasonable Doubt* was in fact Jay-Z's first album, created without any major labels or record deal in 1995 – and sold out of his car. It was only a year later when he found a distribution partner, that the album was catapulted straight to number 23 on the United States' Billboard 200. In 2012, *Reasonable Doubt* was featured in *Rolling Stone's 500 Greatest Albums of All Time* and it easily achieved platinum status industry.

.

## One of the Most Significant NFT Auctions to Date

Selling the copyright to Jay-Z's *Reasonable Doubt* as an NFT is a groundbreaking landmark – both for the crypto space and the broader music industry. The newly minted NFT will prove ownership of the album's copyright, transferring the rights to all future revenue generated by the album from Damon Dash to the auction winner.

The whole process will occur on-chain thanks to the magic of the Ethereum blockchain and SuperFarm's innovative blockchain technology. The significance of this NFT auction cannot be overstated as it will set a precedent for how artistically created value and its ownership can be proven, transferred, and monetized seamlessly through a public blockchain.

The NFT auction will kick off on June 23 on SuperFarm.com and last for two days. June 25 being the 25th anniversary of Jay-Z's iconic first album, is the perfect great day to conclude the auction and release this first of its kind NFT "into the wild".

SuperFarm is thrilled to take this major step and strengthen its place as a leading innovator in the blockchain space and the go-to NFT platform for creators, collectors, gamers, and investors. Stay tuned for more updates on our social media channels!

## How to participate

In order to participate in the auction, you must show up to SuperFarm.com during the auction event and have Ethereum in your wallet ready to bid. The entire process will take place publicly and on the blockchain.

## About SuperFarm

SuperFarm is the next generation of NFT infrastructure living at the intersection of DeFi, gaming, and Non-fungible Tokens. SuperFarm is designed to bring utility to any token by turning it into an NFT farm with no code required. Any project looking to leverage the power of NFTs can find utility in the SuperFarm toolkit.

SuperFarm provides a bridge between current crypto ecosystems and the explosive gaming

**Website: https://superfarm.io**

**Twitter: https://twitter.com/SuperFarmDao**

**Telegram: https://t.me/SuperFarmDAO**

*Reasonable Doubt* was in fact Jay-Z's first album, created without any major labels or record deal in 1995 – and sold out of his car. It was only a year later when he found a distribution partner, that the album was catapulted straight to number 23 on the United States' Billboard 200. In 2012, *Reasonable Doubt* was featured in *Rolling Stone's 500 Greatest Albums of All Time* and it easily achieved platinum status industry.

**Telegram ANN: https://t.me/SuperFarmANN**

# EXHIBIT C



**Driving progress
through partnership**

**Jordan W. Siev**
Direct Phone:  +1 212 205 6085
Email:  jsiev@reedsmith.com

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
reedsmith.com

June 18, 2021

**VIA EMAIL AND FEDEX**

SuperFarm
Dresdner Tower, 11th Floor
50th Street and 55th East Street
Panama City, Panama 00000

**Re:  Legal Notice to Cease Upcoming Auction of Jay-Z Album *Reasonable Doubt***

To Whom It May Concern:

I write on behalf of Roc-A-Fella Records, Inc. ("RAF, Inc.") regarding information we have received concerning a SuperFarm auction scheduled for June 23, 2021, concerning Shawn Carter's, a/k/a Jay-Z, album *Reasonable Doubt*.  If you have legal counsel, please direct this letter to him or her.

Specifically, as reflected in the attached SuperFarm announcement, we have learned that you and Damon Dash intend to auction an NFT reflecting an ownership interest in the copyright to Jay-Z's album *Reasonable Doubt*.  But Dash has no ownership interest in the copyright or the album.  Instead, RAF, Inc. owns all rights in and to *Reasonable Doubt*.  By attempting such a sale, you and Dash have wrongfully converted RAF Inc.'s property and violated RAF Inc.'s rights to this unique asset.  Further, Jay-Z has the rights to the use of his name and likeness, among other rights of publicity, which cannot be exploited in the commercial manner reflected in the SuperFarm marketing materials, and for which damages have already been sustained.

You must therefore cancel the auction immediately, deliver all evidence to RAF, Inc. related to this wrongful conduct, and transfer to RAF, Inc. any and all property reflecting its ownership of *Reasonable Doubt*, including any NFTs you have minted in connection with the auction or otherwise.  We request your complete compliance and confirmation by 5:00pm EDT today or we will be filing a lawsuit against you.  Meanwhile, you are instructed to preserve all documents related to this dispute, including all electronically stored information and any paper files SuperFarm maintains, and we request that you immediately cease any document deletion policies that may exist at SuperFarm.  All of my client's rights and remedies are expressly reserved.

Very truly yours,

*/s/ Jordan W. Siev*

Jordan W. Siev

Attachment

ABU DHABI ♦ ATHENS ♦ AUSTIN ♦ BEIJING ♦ BRUSSELS ♦ CENTURY CITY ♦ CHICAGO ♦ DALLAS ♦ DUBAI ♦ FRANKFURT ♦ HONG KONG
HOUSTON ♦ KAZAKHSTAN ♦ LONDON ♦ LOS ANGELES ♦ MIAMI ♦ MUNICH ♦ NEW YORK ♦ PARIS ♦ PHILADELPHIA ♦ PITTSBURGH ♦ PRINCETON
RICHMOND ♦ SAN FRANCISCO ♦ SHANGHAI ♦ SILICON VALLEY ♦ SINGAPORE ♦ TYSONS ♦ WASHINGTON, D.C. ♦ WILMINGTON

US_ACTIVE-160908190.1-JWSIEV 06/18/2021 2:01 PM

*Reasonable Doubt* was in fact Jay-Z's first album, created without any major labels or record deal in 1995 – and sold out of his car. It was only a year later when he found a distribution partner, that the album was catapulted straight to number 23 on the United States' Billboard 200. In 2012, *Reasonable Doubt* was featured in *Rolling Stone's 500 Greatest Albums of All Time* and it easily achieved platinum status industry.

# SuperFarm Announces NFT Auction for Jay-Z's Iconic Album *Reasonable Doubt*

*graphic*

SuperFarm is proud to announce, in collaboration with Damon Dash, the auction of Damon's ownership of the copyright to Jay-Z's first album *Reasonable Doubt*. This marks a new milestone in the history of NFT's, entitling the new owner to future revenue generated by the unique asset.

The monumental event will last for two days starting on June 23 and concluding on June 25. SuperFarm is excited to host this truly remarkable auction and immortalize one of the world's greatest artists on the blockchain!

## Jay-Z: Hip Hop Icon & Business Mastermind

The world of music wouldn't be the same without the ingenious innovator and business mastermind Jay-Z. His music and business endeavors have not just shaped the world of rap and hip hop but the universal music culture of today.

Jay-Z is famed for being one of the best lyricists, bringing his creative talent not just to his own music but also to the work of famous artists such as Beyoncé and Dr. Dre.

Having sold over 50 million albums and 75 million singles worldwide, Jay-Z is one of the most popular and best-selling musicians of all time. Jay-Z is not just the rapper with the most Grammy Awards – 23 in total – but he also holds the record for the most number-one albums by a solo artist.

Having a musical catalog worth approximately $100 million, Jay-Z has made more money from his music than most other living artists. The fact that his net worth is estimated to be over $1.4 billion shows that Jay-Z is not just a highly influential artist but an equally successful business person.

## *Reasonable Doubt* – Jay-Z's Masterpiece

Jay-Z's remarkably versatile track record is full of highlights. However, his first album *Reasonable Doubt* is certainly at the forefront when it comes to success and significance, as it established Jay as the premier freestyle rapper of his generation. Jay-Z even called *Reasonable Doubt* his "baby" and the "best album that was ever made".

*Reasonable Doubt* was in fact Jay-Z's first album, created without any major labels or record deal in 1995 – and sold out of his car. It was only a year later when he found a distribution partner, that the album was catapulted straight to number 23 on the United States' Billboard 200. In 2012, *Reasonable Doubt* was featured in *Rolling Stone's 500 Greatest Albums of All Time* and it easily achieved platinum status industry.

.

## One of the Most Significant NFT Auctions to Date

Selling the copyright to Jay-Z's *Reasonable Doubt* as an NFT is a groundbreaking landmark – both for the crypto space and the broader music industry. The newly minted NFT will prove ownership of the album's copyright, transferring the rights to all future revenue generated by the album from Damon Dash to the auction winner.

The whole process will occur on-chain thanks to the magic of the Ethereum blockchain and SuperFarm's innovative blockchain technology. The significance of this NFT auction cannot be overstated as it will set a precedent for how artistically created value and its ownership can be proven, transferred, and monetized seamlessly through a public blockchain.

The NFT auction will kick off on June 23 on <u>SuperFarm.com</u> and last for two days. June 25 being the 25th anniversary of Jay-Z's iconic first album, is the perfect great day to conclude the auction and release this first of its kind NFT "into the wild".

SuperFarm is thrilled to take this major step and strengthen its place as a leading innovator in the blockchain space and the go-to NFT platform for creators, collectors, gamers, and investors. Stay tuned for more updates on our social media channels!

## How to participate

In order to participate in the auction, you must show up to SuperFarm.com during the auction event and have Ethereum in your wallet ready to bid. The entire process will take place publicly and on the blockchain.

## About SuperFarm

SuperFarm is the next generation of NFT infrastructure living at the intersection of DeFi, gaming, and Non-fungible Tokens. SuperFarm is designed to bring utility to any token by turning it into an NFT farm with no code required. Any project looking to leverage the power of NFTs can find utility in the SuperFarm toolkit.

SuperFarm provides a bridge between current crypto ecosystems and the explosive gaming

**Website: https://superfarm.io**

**Twitter: https://twitter.com/SuperFarmDao**

**Telegram: https://t.me/SuperFarmDAO**

*Reasonable Doubt* was in fact Jay-Z's first album, created without any major labels or record deal in 1995 – and sold out of his car. It was only a year later when he found a distribution partner, that the album was catapulted straight to number 23 on the United States' Billboard 200. In 2012, *Reasonable Doubt* was featured in *Rolling Stone's 500 Greatest Albums of All Time* and it easily achieved platinum status industry.

**Telegram ANN: https://t.me/SuperFarmANN**

# EXHIBIT D



**Driving progress**
**through partnership**

**Jordan W. Siev**
Direct Phone:  +1 212 205 6085
Email:  jsiev@reedsmith.com

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
reedsmith.com

June 18, 2021

**VIA EMAIL**

Michael S. Traylor, Esq.
Traylor Law Offices
8601 Lincoln Blvd. 180
Suite 525
Los Angeles, CA 90045

**Re:  Legal Notice to Cease Upcoming Auction of Jay-Z Album *Reasonable Doubt***

Dear Michael:

I write on behalf of Roc-A-Fella Records, Inc. ("RAF, Inc.") regarding information we have received concerning a SuperFarm auction scheduled for June 23, 2021, concerning Shawn Carter's, a/k/a Jay-Z, album *Reasonable Doubt*.

Specifically, as reflected in the attached SuperFarm announcement, we have learned that your client Damon Dash and SuperFarm intend to auction an NFT reflecting an ownership interest in the copyright to Jay-Z's album *Reasonable Doubt*.  But Dash has no ownership interest in the copyright or the album. Instead, RAF, Inc. owns all rights in and to *Reasonable Doubt*.  By attempting such a sale, Dash and SuperFarm have wrongfully converted RAF Inc.'s property and violated RAF Inc.'s rights to this unique asset.  Further, Jay-Z has the rights to the use of his name and likeness, among other rights of publicity, which cannot be exploited in the commercial manner reflected in the SuperFarm marketing materials, and for which damages have already been sustained

You must therefore take all necessary steps to cancel the auction immediately, deliver all evidence to RAF, Inc. related to this wrongful conduct, and transfer to RAF, Inc. any and all property reflecting its ownership of *Reasonable Doubt*, including any NFTs your client or SuperFarm have minted in connection with the auction or otherwise.  We request your complete compliance and confirmation by 5:00pm EDT today or we will be filing a lawsuit against Mr. Dash.  Meanwhile, Mr. Dash is instructed to preserve all documents related to this dispute, including all electronically stored information and any paper files he maintains, and we request that he immediately cease any document deletion policies to which his documents may be subject.  All of my client's rights and remedies are expressly reserved.

Very truly yours,

*/s/ Jordan W. Siev*

Jordan W. Siev

Attachment

*Reasonable Doubt* was in fact Jay-Z's first album, created without any major labels or record deal in 1995 – and sold out of his car. It was only a year later when he found a distribution partner, that the album was catapulted straight to number 23 on the United States' Billboard 200. In 2012, *Reasonable Doubt* was featured in *Rolling Stone's 500 Greatest Albums of All Time* and it easily achieved platinum status industry.

# SuperFarm Announces NFT Auction for Jay-Z's Iconic Album *Reasonable Doubt*

graphic

SuperFarm is proud to announce, in collaboration with Damon Dash, the auction of Damon's ownership of the copyright to Jay-Z's first album *Reasonable Doubt*. This marks a new milestone in the history of NFT's, entitling the new owner to future revenue generated by the unique asset.

The monumental event will last for two days starting on June 23 and concluding on June 25. SuperFarm is excited to host this truly remarkable auction and immortalize one of the world's greatest artists on the blockchain!

## Jay-Z: Hip Hop Icon & Business Mastermind

The world of music wouldn't be the same without the ingenious innovator and business mastermind Jay-Z. His music and business endeavors have not just shaped the world of rap and hip hop but the universal music culture of today.

Jay-Z is famed for being one of the best lyricists, bringing his creative talent not just to his own music but also to the work of famous artists such as Beyoncé and Dr. Dre.

Having sold over 50 million albums and 75 million singles worldwide, Jay-Z is one of the most popular and best-selling musicians of all time. Jay-Z is not just the rapper with the most Grammy Awards – 23 in total – but he also holds the record for the most number-one albums by a solo artist.

Having a musical catalog worth approximately $100 million, Jay-Z has made more money from his music than most other living artists. The fact that his net worth is estimated to be over $1.4 billion shows that Jay-Z is not just a highly influential artist but an equally successful business person.

## *Reasonable Doubt* – Jay-Z's Masterpiece

Jay-Z's remarkably versatile track record is full of highlights. However, his first album *Reasonable Doubt* is certainly at the forefront when it comes to success and significance, as it established Jay as the premier freestyle rapper of his generation. Jay-Z even called *Reasonable Doubt* his "baby" and the "best album that was ever made".

*Reasonable Doubt* was in fact Jay-Z's first album, created without any major labels or record deal in 1995 – and sold out of his car. It was only a year later when he found a distribution partner, that the album was catapulted straight to number 23 on the United States' Billboard 200. In 2012, *Reasonable Doubt* was featured in *Rolling Stone's 500 Greatest Albums of All Time* and it easily achieved platinum status industry.

.

## One of the Most Significant NFT Auctions to Date

Selling the copyright to Jay-Z's *Reasonable Doubt* as an NFT is a groundbreaking landmark – both for the crypto space and the broader music industry. The newly minted NFT will prove ownership of the album's copyright, transferring the rights to all future revenue generated by the album from Damon Dash to the auction winner.

The whole process will occur on-chain thanks to the magic of the Ethereum blockchain and SuperFarm's innovative blockchain technology. The significance of this NFT auction cannot be overstated as it will set a precedent for how artistically created value and its ownership can be proven, transferred, and monetized seamlessly through a public blockchain.

The NFT auction will kick off on June 23 on <u>SuperFarm.com</u> and last for two days. June 25 being the 25th anniversary of Jay-Z's iconic first album, is the perfect great day to conclude the auction and release this first of its kind NFT "into the wild".

SuperFarm is thrilled to take this major step and strengthen its place as a leading innovator in the blockchain space and the go-to NFT platform for creators, collectors, gamers, and investors. Stay tuned for more updates on our social media channels!

## How to participate

In order to participate in the auction, you must show up to SuperFarm.com during the auction event and have Ethereum in your wallet ready to bid. The entire process will take place publicly and on the blockchain.

## About SuperFarm

SuperFarm is the next generation of NFT infrastructure living at the intersection of DeFi, gaming, and Non-fungible Tokens. SuperFarm is designed to bring utility to any token by turning it into an NFT farm with no code required. Any project looking to leverage the power of NFTs can find utility in the SuperFarm toolkit.

SuperFarm provides a bridge between current crypto ecosystems and the explosive gaming

**Website: https://superfarm.io**

**Twitter: https://twitter.com/SuperFarmDao**

**Telegram: https://t.me/SuperFarmDAO**

*Reasonable Doubt* was in fact Jay-Z's first album, created without any major labels or record deal in 1995 – and sold out of his car. It was only a year later when he found a distribution partner, that the album was catapulted straight to number 23 on the United States' Billboard 200. In 2012, *Reasonable Doubt* was featured in *Rolling Stone's 500 Greatest Albums of All Time* and it easily achieved platinum status industry.

**Telegram ANN: https://t.me/SuperFarmANN**