**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

Direct Dial 212.849.7364
Email: alexspiro@quinnemanuel.com

July 2, 2021

**VIA ECF**
Honorable John P. Cronan
U.S. District Court for the Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:     **Preliminary Injunction Hearing in *Roc-A-Fella Records, Inc. v. Damon Dash*, No. 1:21-cv-05411-JPC**

Dear Judge Cronan:

I represent Roc-A-Fella Records, Inc.  At the hearing yesterday, the Court asked "what other evidence plaintiff ('RAF, Inc.') ha[s] that Mr. Dash was, in fact, trying to sell the copyright interest in the album [*Reasonable Doubt*]."  (July 1, 2021 Hearing Tr. 10:24-11:1, Exhibit A.)  In response, I referenced, among other things, facts showing that Dash had a significant financial motive to sell RAF, Inc.'s rights in *Reasonable Doubt*.  (*See* Ex. A at 11:2-14:12.)  For example, I stated that Dash has several judgments and liens against him; that Dash has admitted he has no salary or income; and that Judge Jed S. Rakoff found his testimony to be "unworthy of belief" in another lawsuit pending in this District.  (*See id.*)  So the record is complete, I write to provide the documents supporting these statements:

- Attached as Exhibit B is a list of currently known judgments and liens against Dash.

- Attached as Exhibit C is a June 26, 2019 declaration submitted by Dash in *Brooks v. Dash*, 1:19-cv-01944-JSR (S.D.N.Y.), in which he states, among other things, that his "working capital and source of income is essentially gone" and that it would "cause great financial strain" if he were required to travel to Boston for a deposition.  (Ex. C at 1-2.)

- Attached as Exhibit D is a November 12, 2019 declaration submitted by Dash in *Brooks v. Dash* in which he states, among other things, that he does "not have a salary or income," that his "income streams have all been garnished or restrained," and that it is "very difficult" for him to address his "mounting bills."  (Ex. D at 1-2.)

**quinn emanuel urquhart & sullivan, llp**
AUSTIN | BOSTON | BRUSSELS | CHICAGO | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MUNICH |
NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY |
STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

- Attached as Exhibit E is a January 31, 2020 Order from *Brooks v. Dash* in which Judge Rakoff found that Dash (and his company Poppington LLC) had "failed to comply with the terms of the [court's] injunction," even though the court had given Dash a "clear directive." (Ex. E at 1-2.)

- Attached as Exhibit F are April 14, 2020 Findings of Fact and Conclusion of Law from *Brooks v. Dash* in which Judge Rakoff found "Dash's testimony to be unworthy of belief." (Ex. F at 3.) Judge Rakoff noted that Dash "repeatedly disrupted the trial testimony" by "shouting out answers to questions directed at [a] witness, loudly accusing the witness of 'lying,' and repeatedly making gestures and uttering unpleasant noises." (*Id.* at 3 n.3.) Ultimately, Judge Rakoff found against Dash in the amount of $300,000. (*Id.* at 20-21.)

- Attached as Exhibit G is a May 16, 2020 Memorandum Order in *Brooks v. Dash* in which Judge Rakoff stated that he "ha[d] no confidence in [Dash's] ability (or willingness) to pay the judgment" and that "the collection process for plaintiff will be challenging and complex." (Ex. G at 4-5.)

- Attached as Exhibit H is an April 28, 2021 Order re Plaintiff's Motion for Partial Summary Judgment in *Bunn v. Dash*, No. 20-cv-7389-DMG(JCx) (C.D. Cal.), in which the Honorable Dolly M. Gee ruled that it was "undisputed" that Dash had "participated in obtaining [the property of a photographer that he hired] and then failed to return it upon request." (Ex. H at 6.) Accordingly, Judge Gee held that Dash had "wrongfully dispossesse[d]" the plaintiff of her property. (*Id.* at 4.)

- Attached as Exhibit I is a November 20, 2019 article from the *Daily Mail* reporting that Dash "was arrested in connection with $404,000 in unpaid child support."


Respectfully submitted,

*/s/ Alex Spiro*

Alex Spiro

# EXHIBIT A

L71sROCc

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ROC-A-FELLA RECORDS, INC.,

 4               Plaintiff,

 5          v.                          21 Civ. 5411 (JPC)

 6   DAMON DASH,

 7               Defendant.

 8   ------------------------------x
                                        New York, N.Y.
 9                                      July 1, 2021
                                        10:00 a.m.
10
     Before:
11
                      HON. JOHN P. CRONAN,
12
                                        District Judge
13
                          APPEARANCES
14
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
15        Attorneys for Plaintiff
     BY:  ALEXANDER SPIRO
16        LUKE NIKAS

17   TURTURRO LAW, P.C.
          Attorneys for Defendant
18   BY:  NATRAJ BHUSHAN
          ERIC HOWARD
19

20

21

22

23

24

25
```

L71sROCc

1          (Case called)

2          THE DEPUTY CLERK:  Can counsel, starting with the

3     plaintiff, please state your name for the record.

4          MR. SPIRO:  Good morning, your Honor.  This is Alex

5     Spiro and Luke Nikas from Quinn Emanuel Urquhart & Sullivan.

6          THE COURT:  Good morning, Mr. Spiro and Mr. Nikas.

7          MR. BHUSHAN:  Good morning, your Honor.  This is

8     Natraj Bhushan from Turturro Law appearing for the defendant.

9     I also have my co-counsel Eric Howard here as well.

10          THE COURT:  Good morning, Mr. Bhushan and Mr. Howard.

11          Also, I should note for anyone in the well of the

12     courtroom, it is certainly your choice, but if you are

13     vaccinated, you are welcome to take off your mask.  I don't

14     want to be the only one who is taking advantage of our new

15     rules over here.

16          So thank you all for coming in.  I wanted to do this

17     conference in person.  I indicated this at the prior court

18     appearance, if we received opposition from the defendant to

19     injunctive relief.  The response kind of fell in between.

20     There was technically an opposition to injunctive relief, but

21     it also seemed like the parties may be closer to being in

22     agreement, and a typical opposition, folks may be talking a

23     little bit across each other.  So I thought this in-person

24     proceeding might be productive.

25          Before I get to that, let me just quickly, for the

L71sROCc

1     record, state where we are and recite the correct brief

2     background and history of this case.  This case was initiated

3     on June 18.  The plaintiff, Roc-A-Fella Records, filed a

4     complaint as well as a proposed order to show cause and

5     temporary restraining order.  In substance, the complaint

6     alleges that the defendant, Damon Dash, minted what is called a

7     non-fungible token, properly referred to as an NFT, of

8     Shawn Carter's, known as Jay-Z, debut album Reasonable Doubt.

9     Mr. Dash was scouting for a venue on which to sell that NFT.

10    In particular, there was a discussion of an auction house

11    called SuperFarm, which it was believed he was trying to do so.

12          Three days after that, on June 21, I granted the

13    requested temporary restraining order.  That order enjoined the

14    defendant in the typical TRO language, anyone acting in that

15    active concert with him from altering, selling, assigning,

16    encumbering, entrapping with anyone or otherwise disposing of a

17    property interest in Reasonable Doubt.  That included the

18    album's copyright and it included any means such as auctioning

19    an NFT, reflecting such an interest in the album.

20          I also scheduled today's show cause hearing to

21    consider whether a preliminary injunction should be issued.

22    And as I mentioned, the defendant had filed an opposition, in

23    part, maintaining that he was not trying to sell a property

24    interest in the album, but was looking to sell his interest in

25    the plaintiff, Roc-A-Fella Records, of which he is a

L71sROCc

| | |
|---|---|
| 1 | shareholder.  And the defendant also moved to disqualify the |
| 2 | plaintiff's law firm Quinn Emanuel. |
| 3 | I think it probably makes sense to start with that |
| 4 | second issue and that may inform whether or not Mr. Spiro and |
| 5 | Mr. Nikas continue to sit at the table for the other part of |
| 6 | this. |
| 7 | Is there anything else you wish to add, Mr. Bhushan, |
| 8 | from your papers on the motion to disqualify? |
| 9 | MR. BHUSHAN:  No, your Honor. |
| 10 | I think the record, more or less, contains the factual |
| 11 | allegations in the declaration.  That is all we have at the |
| 12 | current juncture. |
| 13 | THE COURT:  Let me just confirm.  My understanding is |
| 14 | that Quinn Emanuel never represented Mr. Dash as opposed to |
| 15 | representing Roc-A-Fella Records. |
| 16 | MR. BHUSHAN:  Your Honor, to the best of my knowledge, |
| 17 | that's true. |
| 18 | THE COURT:  To the best of your knowledge, did Quinn |
| 19 | Emanuel ever obtain any privileged information as to Mr. Dash |
| 20 | in the course of his representation of Roc-A-Fella? |
| 21 | MR. BHUSHAN:  We don't have any evidence of that at |
| 22 | the present current juncture.  Obviously, this case is |
| 23 | pre-discovery.  Insofar as we have to plead an answer or |
| 24 | counterclaim, that's information that we would be seeking to |
| 25 | obtain. |

L71sROCc

1      THE COURT:  Thank you.

2      Mr. Spiro, anything you wish to add?

3      MR. SPIRO:  We think this is a pretty clear nonissue,

4  so I don't need to add anything, if the court doesn't have any

5  further questions for me.

6      THE COURT:  Sure.

7      I would tend to agree with Mr. Spiro, at least at this

8  point.  Obviously, if things change, we could revisit this

9  issue, if appropriate.

10      Let me briefly state for the record my reasons.  In

11  the Second Circuit, disqualification usually is ordered in two

12  types of cases.  One is where there is a conflict of interest

13  that violates either Canon 5 or Canon 9 of the Code of

14  Professional Responsibility, and that conflict undermines the

15  court's confidence in the vigor of an attorney's representation

16  of a client.

17      In the second scenario, I think is a little bit more

18  common, where the attorney is at least potentially in a

19  position to use privileged information concerning the other

20  side through a prior representation.

21      Here, the allegations are largely that Quinn Emanuel,

22  the law firm that is appearing for the plaintiff, cannot

23  represent the plaintiff because it also serves as personal

24  counsel to Shawn Carter, who is a shareholder of the plaintiff.

25  Right now, I've seen no showing that this presents a conflict

L71sROCc

1    of interest.  And, in fact, it appears that Mr. Carter's

2    interests are aligned with the plaintiff's interests.  The mere

3    fact of joint representation does not raise the risk of trial

4    taint, when an attorney represents two or more clients who are

5    similarly situated with regard to a lawsuit and if there are a

6    number of cases that support that.  Just to cite one from this

7    district, Bulkmatic, B-u-l-k-m-a-t-i-c, Transport Company v.

8    Pappas.  It's a 2001 case in this district and at 2001 WL

9    504841.

10            Also, I note that the defendant has not alleged Quinn

11   Emanuel is in a position to use information concerning Mr. Dash

12   through a prior representation or, even as just discussed, that

13   Quinn Emanuel ever represented Mr. Dash.  And Mr. Dash did not

14   allege that Quinn Emanuel represented Roc-A-Fella Records in

15   any matters in which it supplied privileged information as to

16   Mr. Dash.

17            So the motion to disqualify is therefore denied, and

18   we should turn to the request for injunctive relief.  I

19   previewed that a little bit at the beginning, but I wanted to

20   start to find out where we are, as it seems like there may be a

21   degree of agreement between the parties.

22            Mr. Dash submitted a declaration that represented that

23   he does not oppose any branch of the motion that seeks to

24   prevent him or any shareholder of Roc-A-Fella Records from

25   altering in any way, selling, assigning, pledging, encumbering,

L71sROCc

1    contracting with regard to, or in any way disposing of the

2    Reasonable Doubt copyright.  He, in fact, acknowledges he

3    doesn't own that copyright, but only opposes the motion to the

4    extent it could be read to dispose of his interest, to prevent

5    him from disposing of his interest in Roc-A-Fella Records.

6         The plaintiff's papers at docket 19 write that the

7    plaintiff at least is not currently asking the court to prevent

8    Mr. Dash from selling his interest in the company.  I think it

9    was said that's a fight for another day.

10        So maybe I'll start with you, Mr. Bhushan.  Am I

11   understanding that correctly; you are not opposing injunctive

12   relief that would prevent your client from disposing of the

13   copyright?

14        MR. BHUSHAN:  Yes, your Honor.

15        We basically take the position that to preserve status

16   quo, nothing is necessary because there was nothing minted,

17   there was never an interest taken in the copyright.

18        Having said that, as your Honor just read, this fight

19   for another day, as we read the TRO, which is being asked to

20   more or less be extended to the preliminary injunction, this

21   language "property interest in Reasonable Doubt," we would ask

22   the court to clarify that so as to exclude any shares in

23   Roc-A-Fella, Inc., and that is the matter of construction that

24   we take issue with.

25        THE COURT:  Mr. Spiro, if the preliminary injunction

L71sROCc

1   were modified in that way and made clear that it only pertains

2   to copyright the album and does not, at least at this stage, in

3   any way restrict Mr. Dash from trying to sell his interest in

4   the actual company, would there be any opposition to that

5   modification?

6          MR. SPIRO:  It would have to include property.  It

7   can't just be the word copyright.  It would have to include all

8   of the property interests that are contained within the LLC.

9   So if it was clear as to that, then I think there is a meeting

10  of the minds.

11         I would also just simply say that I don't believe the

12  court can or should at least start, comma, explaining what it

13  does not cover, because that is not the motion that is before

14  your Honor.

15         But that being said, we would have no objection.  I

16  read the order and I was actually going to ask to understand

17  what about this order is not clear.  I read it as very clear.

18  So one of the questions I had is, is there some word or

19  sentence within this that is unclear.  I don't see one.

20         But, of course, if the court wanted to make it even

21  more clear, I would never object to such a thing, again, so

22  long as it doesn't then start categorizing other property as

23  making other rulings and findings about things that are not

24  properly before the court as a case or controversy.  That would

25  be our position.

L71sROCc

1          THE COURT:  Mr. Bhushan, what language in particular

2     are you concerned about, and do you have a proposal for the

3     current order?

4          MR. BHUSHAN:  Your Honor, it is the clause that

5     basically begins "or in any way disposing of any property

6     interest in Reasonable Doubt."

7          It is our understanding that, perhaps, everyone in the

8     room agrees that this is what the language means, but to third

9     parties, that is not clear, and that is the issue.  Insofar as

10    they have already once attempted to, as we submit in the

11    declaration, tortiously interfere with the lawful sale of an

12    interest.

13         And SuperFarm was persuaded, but even before the TRO,

14    just based on similar language, to walk away, cease and desist

15    in conducting an auction.  This property interest language to

16    us and to other third parties is a little vague.  I mean, if

17    the court wants to expressly carve out shares in Roc-A-Fella

18    Records, Inc., or something to that effect, that is our clear

19    property interest, then that would be acceptable to us.

20         But that's effectively what the complaint as to the

21    opposition is about.

22         MR. SPIRO:  Your Honor, if I may, just very briefly?

23         THE COURT:  Please.

24         MR. SPIRO:  So it's right.  Because what ends up

25    happening is, again, I think that the wording here is proper,

L71sROCc

1    but it includes copyrights, trademarks, rights of personality,

2    packaging.  There is dozens of rights in residual rights.  I

3    know the court knows that.

4         The second thing I would just simply say is -- and I

5    don't want to, given the tenor here and where we are at with

6    the consent of the opposition, go too deep down the rabbit hole

7    of fact.  But we are only in this position where the order is

8    being entered because we had to have an emergency hearing on an

9    auction that was going to happen.  That is clear as day in

10   words written in English that was a collaboration that

11   everybody understood that speaks for themselves.

12        I don't need to revisit all of that here today, but it

13   is a little hard.  It is a little hard to square taking that

14   aggressive an action and quivering over the fact that the order

15   can be interpreted in another way.

16        THE COURT:  So let me just briefly ask you about that,

17   Mr. Spiro.

18        The way I read Mr. Dash's declaration is, to really

19   very much paraphrase, the auction house got it wrong.  This

20   press release was not what I was trying to do.  They

21   mischaracterized what was being auctioned.  Obviously, the

22   declaration from Mr. Carter included the press release, and we

23   touched upon this a little bit last week.

24        But what else, what other information, what other

25   evidence does the plaintiff have that Mr. Dash was, in fact,

L71sROCc

1    trying to sell the copyright interest in the album?

2              MR. SPIRO:  Sure.

3              So the press release begins by saying it is a

4    collaboration.  It then goes on for many pages and has many

5    sentences and many words in which it makes clear, beyond all

6    doubt, exactly what Mr. Dash was trying to do.  This wasn't

7    some, as he calls it -- and I think your Honor should note the

8    word -- he calls it an internal memo.  A press release is the

9    opposite of an internal memo.  This press release also included

10   links to every social media, every site that it could.

11             You may also note, so, again, the words, the words,

12   right.  The other thing is, and I think your Honor can take

13   account of all of these things, the auction was set to take

14   place on the 23rd, two days before the anniversary, right?  And

15   it is clear, obviously, from all the papers, right, that I

16   don't want to call it a sneak attack or a before the bell is

17   rung, but it is two days before, and I would comment, a bit

18   suspicious.  And neither shareholder of Roc-A-Fella, neither

19   other Roc-A-Fella, Inc. shareholder knew about it, right, which

20   is clear.  I think that circumstance the court can certainly

21   question the veracity of the declaration.

22             In addition, it's not just the press release, right.

23   There were lawyers that are involved, right, in both the

24   minting and in responding to a cease and desist.  And the

25   lawyers does not respond to the cease and desist saying, Oh, my

L71sROCc

1   goodness.  We must have just crossed wires here.  I must have

2   misunderstood Mr. Dash when I wrote into this press release

3   five times exactly what he was aiming to sell.  That was a huge

4   miscommunication.  That is not what they said.  You know what

5   they said?  Mr. Dash told us he owned this.  That's what they

6   said.

7          In addition, you will notice that Mr. Dash, in his

8   declaration, talks about how SuperFarm had advertisements that

9   they were then going to halt, right.  So that means that the

10  auction house is so confident, so confident that this auction

11  is happening with exactly what they say in the press release,

12  a day after the court issued the TRO, that they are spending

13  money to advertise it.

14         All that Mr. Dash can sort of say is, reasons unknown,

15  quote-unquote.  Reasons unknown.  It also doesn't really make

16  any sense what he is saying in his declaration.  I mean,

17  basically he concedes every single possible fact regarding this

18  matter, which is why they are consenting, in large part, to the

19  action.  But right, it is one of those admit what you can't

20  deny and deny what you can't possibly admit situations, where

21  he is now saying it was going to be a hologram of an LLC

22  interest of shares.  But, of course, that doesn't really make

23  any sense, isn't something that would excite the marketplace,

24  isn't something that would be the first ever, you know, most

25  exciting auction in the history of the world.

L71sROCc

1          He writes, his lawyers write in his e-mail back to me,

2     he was intending to make $30 million, right.  That is not the

3     kind of auction -- it doesn't feel like the kind of auction

4     where you're just saying, Oh, I own this LLC that might own

5     other things, and that is not as interesting of a thing to go

6     to marketplace with, which is why he didn't do that, which is

7     why he tried to take corporate property.

8          And, you know, I think having sort of, you know, you

9     see him running into the bank with the bank note that says, you

10    know, this is what I intend to do in the form of a press

11    release.  And then, you know, the person who gets tackled on

12    the door steps of the bank can say whatever they want.  I

13    appreciate that.  He did.

14         But if the court also wants other information

15    regarding Mr. Dash's motives and tendencies, you know, I have

16    ample information about that.  Mr. Dash has -- let's put it

17    this way.  This is not the first time that there have been

18    certain issues regarding Mr. Dash.  He is, in terms of his

19    economic interest and his interests to, you know, his

20    motivations to need money and need money quickly, there is

21    ample evidence he is, I understand it from filings both in this

22    courthouse and in other districts, he is number 40 on the

23    New York delinquent taxpayer's list.  He has dozens and dozens

24    of liens and judgments against him.  He is the defendant in

25    dozens and dozens of civil cases.  He has federal and state tax

L71sROCc

1    liens.  He has over a million dollars in unpaid child support,

2    according to an attorney who has sued him in other districts.

3    He has been arrested for failure to pay child support.  He has

4    admitted in declarations in this very courthouse that he does

5    not have a salary or income.

6         He appeared before Judge Rakoff on a violation of a

7    different court order in which Judge Rakoff found him, in

8    Brooks v. Dash, 1-19-CV-1944, and it's both included in Judge

9    Rakoff's sanctions order and also in his finding that Mr. Dash

10   lacks credibility and civility, that he says, quote-unquote,

11   this is Judge Rakoff, he finds Dash's testimony to be unworthy

12   of belief.

13        THE COURT:  I'm not sure we need to go more down that

14   road here.

15        It would seem to me that the language in the proposed

16   order covers the album and the interest in the album.  But I'm

17   not sure there is any problem in making that even clearer, in

18   case there is any concern or confusion.

19        One thought I want to run by the parties is to add

20   language that says something along the lines of "this

21   injunctive relief does not extend to any efforts by the

22   defendant to sell any shares in Roc-A-Fella Records, which is

23   not a matter not presently before the court."  Making clear

24   that that is not an issue presently before the court, but also

25   making clear that the injunctive relief only applies to the

L71sROCc

album.

          Mr. Bhushan, would that language satisfy your concern?

          MR. BHUSHAN:  Your Honor, insofar as it is understood that that includes in any manner, shape, or form.  Because again, this NFT world may misconstrue what's before the court and what is not before the court and whether or not an actual sale of the shares or representation of the shares, we want encapsulate that as well.  I think that is our concern.

          But, your Honor, insofar as Mr. Spiro has argued the preliminary injunction, we would also like to be heard on that, I think.

          THE COURT:  Go ahead.

          MR. BHUSHAN:  With respect to Exhibit B, this, quote-unquote, press release, as the court can plainly see from the document, there is no date on it.  It actually has an insert graphic picture on it.  There is not a single quote cited from my client.  So this is the only evidence that they are relying on.  Their interpretation of, again, a draft memo versus the actual declaration from the party that was dealing with SuperFarm.

          As the court is well aware, the Second Circuit requires a clear showing to grant this extraordinary and drastic relief.  There is anything but in this case.  That's all they had.  Aside from that, we just heard character attacks.  That is basically it.

L71sROCc

1          But to your Honor's question, to the extent that it is

2     clear that the shares are not included in this injunctive

3     relief and there is no preclusion as to disposing of them,

4     transferring them, encumbering them in any manner or means,

5     that that would be acceptable to the defendant.

6          THE COURT:  Now, I don't know if there would be a

7     basis for the plaintiff to later make an application to prevent

8     disposal of the shares.  I don't know how the contract reads

9     and if there would be a valid basis or not.  But this order

10    would have no impact one way or the other on that.

11         If there is an appropriate basis for such an

12    application, I presume Mr. Spiro can make that application.

13    But in terms of this, the injunctive relief here, and the case

14    before me right now, it only concerns the copyright interest in

15    the album itself.  It doesn't concern Mr. Dash's efforts to

16    sell his interest in the company itself.

17         Mr. Spiro, do you wish to be heard on that?

18         MR. SPIRO:  Just briefly.  Again, I'm going to mostly

19    resist going down the rabbit hole, but I would simply say the

20    other person who was involved in this act of trying to sell has

21    confirmed that Mr. Dash represented what we are alleging he

22    represented, and I don't see Mr. Dash's declaration, other than

23    saying reasons unknown, got confused, in terms of the

24    imminence.  I mean, the press release says the date, and it was

25    a day after the order was entered.  I don't know if a TRO under

L71sROCc

1    more urgent imminent circumstances.  So I think we can all

2    agree that if this did hit the marketplace and hit the

3    worldwide web, it is a genie out of the bottle that can never

4    be put back.

5           In terms of where we are in the language of the order,

6    again, I would just simply say that it's tricky because the

7    issues of whatever else he's looking to do are not before the

8    court, as we have all discussed.  So it is not a ripe case of

9    controversy, and I can imagine many permutations which would

10   affect that analysis, which is why we often wait for a case of

11   controversy.

12          If there was a phrase that said "this order only

13   pertains to what it pertains to," as if that is not already

14   self-explanatory, and if Mr. Dash owns shares in something,

15   again, if, if, and if there is no other encumbrance, and if,

16   if, then this order doesn't speak to that.

17          But I don't want the phrase to be read as, you know,

18   this is off limits and I, I as the judge, am saying this is for

19   sure good to go, right.  That is not really what this

20   proceeding is, and we don't have an opportunity to respond to

21   that.

22          I would just also say that it is not the case, and

23   your Honor cited this when we were together before, WPIX, the

24   Second Circuit case talks about considerations that a judge can

25   take into account when issuing a TRO or an injunction.  And one

L71sROCc

1  of those does include the comfort that the court can have that

2  the court's orders are going to be followed and that have

3  monetary relief, if the defendant were to become a bad actor,

4  right.

5         So all of the things that we have put on the record

6  are for sure relevant to such a consideration, in our view, and

7  I just don't think we should be too expansive in any changes to

8  this order.  Because I think it is going to lead to further

9  confusion where the record today is clear, the transcript can

10  be ordered and shown to anybody that Mr. Dash were to do

11  business with.  But the court's order and the actual proceeding

12  in case of controversy is limited to its four corners.

13         Thank you.  I have nothing further, your Honor.

14         THE COURT:  Thank you.

15         I think given -- Mr. Bhushan, please correct me if I'm

16  mischaracterizing the defense -- but the defendant's lack of an

17  objection to a preliminary injunction that would be limited

18  only to the property rights of the album, I think it would be

19  appropriate to issue the preliminary injunction, but include

20  language making clear that the order only pertains to that

21  issue.

22         What I'll do, I'll give the parties until five p.m.

23  today to propose language that you think would be appropriate.

24         Mr. Spiro, the TRO expires today, right?

25         MR. SPIRO:  I believe your Honor set it to expire

L71sROCc

1    today, yes.

2            THE COURT:  So I will allow for a showing of finding,

3    given the reasons we discussed, good cause to extend the TRO

4    through tomorrow.  So the parties should submit by close of

5    business today proposed language that I will consider for the

6    preliminary injunction and either adopt language.

7            Ideally, a joint submission would be preferred, but if

8    that is not the case, I would consider the language and figure

9    out what is appropriate to enter.  But it should be essentially

10   making clear that the injunctive relief here only pertains to

11   what is before the court, and what I understand to be before me

12   is the question of the copyright and Reasonable Doubt.  It does

13   not concern whether Mr. Dash is able to sell his property

14   shares, to the extent whatever he may have in Roc-A-Fella

15   Records, as the plaintiff pointed out in their papers, that's

16   for another day.

17           Any questions for clarification from either of you?

18           Mr. Spiro?

19           MR. SPIRO:  No, your Honor.

20           THE COURT:  Mr. Bhushan?

21           MR. BHUSHAN:  No, your Honor.

22           THE COURT:  Great.  Well, thank you, all.

23           I don't think there is anything else for us to take up

24   today.

25           Is there from the plaintiff?

L71sROCc

1              MR. SPIRO:  No, your Honor.

2              THE COURT:  And defendant?

3              MR. BHUSHAN:  Nothing, your Honor.

4              THE COURT:  All right.  Thank you for coming in on

5     relatively short notice, and I look forward to receiving

6     submissions from the parties.

7              Have a good rest of the day and good holiday weekend.

8              MR. SPIRO:  Thank you, your Honor.

9              MR. BHUSHAN:  Thanks, Judge.

10             (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

Our databases, along with available public records on file with local, state, and federal courts, were searched for any judgments, liens, and bankruptcies naming our subject. This search, which was performed via *name match only*, returned the following results:

| | |
|---|---|
| Debtor | Damon Dash |
| Creditor | Not Listed |
| Recording Date | 2/19/21 |
| Serial Lien Cert. # | 21049316825 |
| Amount | $77,991 |
| Type | State Tax Lien; Placement |
| Kind of Tax | Franchise Tax |
| Disposition | Not Listed |
| County | Los Angeles, CA |

| | |
|---|---|
| Debtor | Damon Dash |
| Creditor | Internal Revenue Services |
| Recording Date | 1/28/20 |
| Filing # | 20200103412 |
| Serial Lien Cert. # | 402568520 |
| Amount | $147,430 |
| Type | Federal Tax Lien |
| Fed. Tax Lien Area | Small Business |
| Disposition | Not Listed |
| County | Los Angeles, CA |

| | |
|---|---|
| Debtor | Damon Dash |
| Creditor | Internal Revenue Service |
| Recording Date | 9/12/19 |
| Filing # | 20190940216 |
| Tax Lien Cert. # | 376306119 |
| Amount | $3,579 |
| Type | Federal Tax Lien |
| Fed. Tax Lien Area | Small Business |
| Disposition | Not Listed |
| County | Los Angeles, CA |

| | |
|---|---|
| Debtor | Damon A. Dash |
| Creditor | Commission of Tax and Finance |
| Recording Date | 6/12/19 |
| Filing # | NX27765A1 |



Back Support Amt.     $42,209
Type                  Abstract of Support Judgment; Placement
Disposition           Not Listed
County                Putnam, NY


Debtor                Damon Dash
Creditor              State of New York
Filing Date           3/13/19
Filing #              E006701377W1489
Amount                $2,715
Type                  State Tax Warrant
Disposition           Not Listed
County                Albany, NY


Debtor                Damon Dash
Creditor              State of New York
Filing Date           6/6/18
Filing #              E047383599W0015
Amount                $1,216
Type                  State Tax Warrant
Disposition           Released 10/10/18
County                Albany, NY


Debtor                Damon Dash
Creditor              Rachel Roy
Filing Date           11/2/16
Filing #              3538086
Amount                $28,026
Type                  Civil Judgment
Disposition           Not Listed
County                New York, NY


Debtor                Damon Dash
Creditor              Iroyrachel
Filing Date           9/30/15
Filing #              003404432
Amount                $354,985

Type                Civil Judgment
Disposition         Not Listed
County              New York, NY


Debtor              Damon Dash
Creditor            State of New York
Filing Date         4/7/15
Filing #            E006701377W1398
Amount              $2,167
Type                State Tax Warrant
Disposition         Not Listed
County              Putnam, NY


Debtor              Damon Dash
Creditor            Eastern Savings Bank FSB
Filing Date         7/29/13
Filing #            003132956
Amount              $765,746
Type                Civil Judgment
Disposition         Not Listed
County              New York, NY


Debtor              Damon A. Dash
Creditor            Assante Business Management
Filing Date         11/30/11
Court Case #        002917395
Amount              $199,849
Type                Civil Judgment
Disposition         Not Listed
County              New York, NY


Debtor              Damon Dash
Plaintiff           State of New York
Filing Date         8/27/11
Filing #            Not Listed
Alt. Court Case #   00517704792



Amount                    $456
Type                      State Tax Warrant
Disposition               Released 11/16/11
County                    New York, NY


Debtor 1                  Damon Dash
Debtor 2                  Rachel Dash
Plaintiff                 Sugar Warehouse
Filing Date               8/26/11
Court Case #              201114779
Amount                    $62,157
Type                      Civil Judgment
Disposition               Not Listed
County                    Rensselaer, NY


Debtor                    Damon Dash
Plaintiff                 Internal Revenue Service
Filing Date               7/28/11
Filing #                  Not Listed
Alt. Court Case #s        00516733822 & 800873911
Amount                    $4,724
Type                      Federal Tax Lien
Disposition               Not Listed
County                    New York, NY


Debtor 1                  Damon Dash
Debtor 2                  Damon Dash Enterprises LLC
Plaintiff                 Kerrison and Willo Ughby Ltd.
Filing Date               7/26/11
Court Case #              002860501
Amount                    $330,038
Type                      Civil Judgment
Disposition               Not Listed
County                    New York, NY



Debtor 1                  Damon Dash
Debtor 2                  Rachel Dash
Plaintiff                 Sugar Warehouse
Filing Date               7/6/11
Court Case #              002854256



| | |
|---|---|
| Amount | $62,157 |
| Type | Civil Judgment |
| Disposition | Released 10/26/11 |
| County | New York, NY |

| | |
|---|---|
| Debtor | Damon Dash |
| Plaintiff | Internal Revenue Service |
| Filing Date | 6/30/11 |
| Filing # | Not Listed |
| Alt. Court Case #s | 00515991874 & 793478111 |
| Amount | $2,984,364 |
| Type | Federal Tax Lien |
| Disposition | Not Listed |
| County | New York, NY |

| | |
|---|---|
| Debtor | Damon Dash |
| Plaintiff | Pryor Cashman LLP |
| Filing Date | 3/23/10 |
| Court Case # | T00284510 |
| Amount | $29,901 |
| Type | Civil Judgment |
| Disposition | Not Listed |
| County | Not Listed |

| | |
|---|---|
| Debtor | Damon Dash |
| Plaintiff | Pryor Cashman LLP |
| Filing Date | 2/2/10 |
| Court Case # | 002657952 |
| Amount | $29,901 |
| Type | Civil Judgment |
| Disposition | Not Listed |
| County | New York, NY |

| | |
|---|---|
| Debtor 1 | Damon Dash |
| Debtor 2 | Rachel Dash |
| Plaintiff | Board of the Manager S of the ATA LA |
| Filing Date | 1/26/10 |
| Court Case # | 002655775 |



Amount            $85,477
Type              Civil Judgment
Disposition       Released 9/21/11
County            New York, NY


Debtor            Damon Dash
Plaintiff         Benson Torres Kasowitz
Filing Date       2/6/09
Court Case #      002519420
Amount            $59,024
Type              Civil Judgment
Disposition       Not Listed
County            New York, NY


Debtor            Damon Dash
Creditor          Eastern Savings Bank FSB
Filing Date       8/18/08
Filing #          002450383
Amount            Not Listed
Type              Lis Pendens Notice
Disposition       Not Listed
County            New York, NY


Debtor            Damon Dash
Creditor          State of New Jersey
Filing Date       4/17/08
Filing #          DJ08923008
Alt. Court Case # 00482993136
Amount            $132,232
Type              State Tax Lien
Disposition       Not Listed
County            Mercer, NJ




Debtor            Damon Dash
Creditor          State of New York
Filing Date       3/29/08
Filing #          002405917
Alt. Court Case # 00483236842



| | |
|---|---|
| Amount | $1,456 |
| Type | State Tax Warrant |
| Disposition | Not Listed |
| County | New York, NY |

| | |
|---|---|
| Debtor 1 | Damon Dash |
| Debtor 2 | Damon Dash Enterprises I LLC |
| Creditor | 25 West 39th Street Holdings LLC |
| Filing Date | 12/11/07 |
| Filing # | 002351502 |
| Amount | $95,265 |
| Type | Civil New Filing |
| Disposition | Not Listed |
| County | New York, NY |

| | |
|---|---|
| Debtor | Damon Dash |
| Creditor | Not Listed |
| Recording Date | 11/15/07 |
| Filing # | Not Listed |
| Amount | $35,007 |
| Type | Federal Tax Lien; Placement |
| Disposition | Not Listed |
| County | New York, NY |

| | |
|---|---|
| Debtor | Damon Dash |
| Creditor | Commissioner of Labor, State of New York |
| Filing Date | 8/23/07 |
| Filing # | Not Listed |
| Amount | $3,591.07 |
| Type | Judgments Docket |
| Disposition | Not Listed |
| State | NY |

| | |
|---|---|
| Debtor | Damon Dash |
| Plaintiff | Internal Revenue Service |
| Filing Date | 8/22/07 |
| Filing # | 20071968604 |
| Serial Lien Cert. # | 383942707 |



Alt. Court Case #        00470524299
Amount                   $35,785
Type                     Federal Tax Lien
Fed. Tax Lien Area       Small Business
Disposition              Released 6/16/08
County                   Los Angeles, CA


Debtor                   Damon Dash
Creditor                 Internal Revenue Service
Filing Date              5/21/07
Filing #                 2007051500244003
Alt. Court Case #        00480865062
Amount                   $35,709
Type                     Federal Tax Lien
Disposition              Released 6/20/08
County                   New York, NY


Debtor                   Damon Dash
Creditor                 Internal Revenue Service
Filing Date              5/2/07
Filing #                 2007042700714013
Amount                   $35,629
Type                     Federal Tax Lien
Disposition              Not Listed
County                   New York, NY


Debtor                   Damon Dash
Creditor                 New York State Department of Taxation and Finance
Filing Date              4/6/07
Filing #                 E006701377
Alt. Court Case #        00465020718
Amount                   $2,093,618
Type                     State Tax Warrant
Disposition              Not Listed
County                   New York, NY


Debtor                   Damon Dash
Creditor                 State of New York
Filing Date              4/3/07
Filing #                 002255587
Amount                   $2,093,618



| | |
|---|---|
| Type | State Tax Warrant |
| Disposition | Not Listed |
| County | New York, NY |

| | |
|---|---|
| Debtor | Damon Dash |
| Creditor | State of New York |
| Filing Date | 8/12/06 |
| Filing # | 002163079 |
| Amount | $12,225 |
| Type | State Warrant Tax Release |
| Disposition | Released 12/28/06 |
| County | New York, NY |

| | |
|---|---|
| Debtor | Damon Dash |
| Plaintiff | State of California |
| Filing Date | 6/26/06 |
| Filing # | 061407404 |
| Alt. Court Case #s | W300188127 & 00339654171 |
| Amount | $3,666 |
| Type | State Tax Lien |
| Kind of Tax | Unemployment Insurance |
| Disposition | Released 2/9/07 |
| County | Los Angeles, CA |

| | |
|---|---|
| Debtor | Damon Dash |
| Creditor | Internal Revenue Service |
| Filing Date | 5/22/06 |
| Filing # | Not Listed |
| Amount | $7,897 |
| Type | Federal Tax Lien |
| Disposition | Not Listed |
| County | New York, NY |

| | |
|---|---|
| Debtor | Damon Dash |
| Creditor | Employment Development Department |
| Filing Date | 5/12/06 |
| Filing # | 067069977415 |
| Amount | Not Listed |



| | |
|---|---|
| Type | Termination |
| Disposition | Unlapsed |
| County | CA |

| | |
|---|---|
| Debtor | Damon Dash |
| Creditor | Ian J. Hirsch |
| Filing Date | 6/29/04 |
| Filing # | DC-013949-2004 |
| Amount | $3,768.02 |
| Type | Civil Suit |
| Disposition | Not Listed |
| County | Bergen, NJ |

| | |
|---|---|
| Debtor | Damon Dash |
| Creditor | Criminal Court City of New York |
| Filing Date | 6/27/96 |
| Filing # | 000950688 |
| Amount | $155 |
| Type | Civil New Filing |
| Disposition | Not Listed |
| County | New York, NY |

| | |
|---|---|
| Debtor | Damon Dash |
| Creditor | New York State Department of Taxation and Finance |
| Filing Date | 11/16/95 |
| Filing # | E006701377 |
| Amount | $81.13 |
| Type | State Tax Warrant |
| Disposition | Released 5/1/97 |
| County | New York, NY |

| | |
|---|---|
| Debtor | Damon Dash |
| Creditor | State of New York |
| Filing Date | 11/9/95 |
| Filing # | 000812834 |
| Amount | $81 |



| | |
|---|---|
| Type | State Tax Warrant Release |
| Disposition | Released 5/1/97 |
| County | New York, NY |

| | |
|---|---|
| Debtor | Damon Dash |
| Creditor | State of New York |
| Filing Date | 2/13/95 |
| Filing # | 000738298 |
| Amount | $133 |
| Type | State Tax Warrant Release |
| Disposition | Released 4/2/97 |
| County | New York, NY |

| | |
|---|---|
| Debtor | Damon A. Dash |
| Creditor | Nassau Department of Social Services |
| Filing Date | 5/17/94 |
| Filing # | Not Listed |
| Amount | $6,450 |
| Type | Not Listed |
| Disposition | Not Listed |
| County | New York, NY |

| | |
|---|---|
| Debtor | Damon A. Dash |
| Creditor | Nassau Family Court |
| Filing Date | 5/2/94 |
| Filing # | Not Listed |
| Amount | $3,410 |
| Type | Not Listed |
| Disposition | Not Listed |
| County | New York, NY |

| | |
|---|---|
| Debtor | Damon Dash |
| Creditor | State of New York |
| Filing Date | 12/31/93 |



**CTS Research** | Licensed Private Investigators

Filing #            000617203
Amount             $52
Type               State Tax Warrant Release
Disposition        Released 5/1/97
County             New York, NY


Debtor             Damon Dash
Creditor           Not Listed
Filing Date        11/10/93
Filing #           00000006126
Amount             $11,167
Type               Federal Tax Lien
Disposition        Released
County             New York, NY


Debtor             Damon Dash
Creditor           State of New York
Filing Date        6/30/93
Filing #           000565596
Amount             $2,840
Type               State Tax Warrant Release
Disposition        Released 5/1/97
County             New York, NY


# UNIFORM COMMERCIAL CODES (UCC)


Our databases along with available public records were searched for any Uniform Commercial
Code filings which were recorded in the relevant jurisdictions for which our subject has resided.
This search returned the following results:



**CTS Research**  |  Licensed Private Investigators

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

EDWYNA W. BROOKS D/B/A
EW BROOKS BROOKS LLC

                           Plaintiff,

            -against-

DAMON ANTHONY DASH and
POPPINGTON LLC d/b/a DAMON
DASH STUDIOS

                         Defendants.

---

Case 1:19-cv-01944-JSR

**DECLARATION**

I, Damon Dash, declare the following under penalty of perjury:

1. As this court has been informed, after being made aware of the request to take my deposition, I asked my attorney to try and appear for a deposition here in California or by remote means as there are two NY warrants that were issued against me in connection with two separate judgment creditors which is presently being addressed in an interpleader action pending in the Supreme Court of the State of New York, NY County ("Case").

2. The proposed resolution to the Case, which was negotiated in the last week or so is costing me in excess of seven figures, which has put enormous financial strain on me at this juncture.

3. In any case, I am domiciled in California and so is co-defendant Poppington LLC. I have resided here for more than two years (prior to that I lived in North Carolina for two years). Everything that is relevant to this case is in California or North Carolina.

4. While the facts and law of every case is different, all of the litigation that I have been involved in the state of NY (whether I was the Plaintiff/Defendant or third party) over the last couple of years have not resulted in any physical appearance by me in the state of New York as this was not possible for me to do for the above-mentioned reasons that I've been fighting years to resolve. This includes past cases filed in this very court. This is the main reason why I asked the court to transfer this case to a more convenient forum for all parties.

5. In short, I am aware of my obligations to comply with discovery but at this moment in time, my working capital and source of income is essentially gone so it would cause great financial strain to fly to a place like Boston to be deposed in person given the amount of

money that I was relying upon now being used to settle the Case. I remain available to be deposed here in California or by remote means (while I remain in California).

6. For the foregoing reasons, I respectfully ask this court to deny the Plaintiff's application for sanctions.

I declare under penalty of perjury under the laws of the United States of America and California that the foregoing is true and correct.

Date: June 26, 2019
Los Angeles, California

Damon Dash

# EXHIBIT D

```
                                    ┌─────────────────────────────┐
                                    │ USDC SDNY                   │
                                    │ DOCUMENT                    │
                                    │ ELECTRONICALLY FILED        │
                                    │ DOC #:_____               │
                                    │ DATE FILED: __11/12/19__    │
                                    └─────────────────────────────┘
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -x

EDWYNA W. BROOKS d/b/a EW BROOKS
LLC,

Action No.: 19-1944-JS

                                        Plaintiff,

        - against -

DAMON ANTHONY DASH and POPPINGTON             DECLARATION OF DAMON
DASH                                          DASH
LLC d/b/a DAMON DASH STUDIOS,

                                        Defendants.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -x

        I declare under penalty of perjury under the laws of the United States of America and California that the foregoing is true and correct.

        1. I submit this Declaration attesting to the present financial hardship that I am facing which is why I have not been able to pay the deposition transcript costs.

        2. As suggested in the joint letter, I not have a salary or income, but depend solely on my business to provide me with some personal income. This personal income is virtually non-existent in recent times except for some one-off television projects and one substantial monetary settlement with Lee Daniels, the Academy Award nominated director.

        3. In sum, virtually all of the revenues my business (Poppington LLC) generates is being utilized by this business to sustain itself, pay its employees and overhead and, hopefully break even (profit wise) over time.

        4.        Due to the confidential and personal nature of certain documents, I am sending copies of garnishment notices, restraining notices, expenses, etc. separately for the Court to consider as directed.

        5. More specifically, in roughly the last six months (which is when the remote deposition took place), I received no salary or distributions from my business and was primarily depending on the quarterly settlement payments I was supposed to receive from a lawsuit that I settled with Lee Daniels ("Settlement") to pay all of my personal and business expenses.

        6. These expenses and obligations are substantial and, importantly, at the time the planned deposition was to go forward in Boston (two months ago), the monies owed to individuals, vendors, landlord, etc. was roughly $100,000. An itemized list of these expenses is being submitted separately.

        7. The Court will note that additional expenses were incurred due to the pregnancy of his fiancé, Raquel Horn.

        8. In short, this roughly $100,000 of expenses has since ballooned by tens of thousands of dollars as I did not receive the $105,000 he was expecting to receive from the Settlement in April and July 2019 due to the money being tied up by restraining notices and motions in an interpleader action filed by his creditors. Copies of the Lee Daniels settlement and related restraining notices are being submitted separately. Again, my attorneys in the interpleader are working to resolve the dispute, but as a result of that interpleader action, the creditors seek to take all of these settlement payments for the next two years or so and redirect them to the themselves, all of which has put me in an extremely dire financial situation right now.

        9. In short, my income streams have all been garnished or restrained presently and it is very difficult to address the mounting bills until I receive some relief from the Courts in which the various cases referred to are resolved. Thus, I would love to comply with the Court Order

directing me to pay the transcript costs, but cannot presently pay these costs; when funds are available (which may be as soon as January 2020) when these cases are resolved, this cost can and will be paid to Plaintiff's counsel as ordered.

For the foregoing reasons, I respectfully ask this Court to deny any extra sanction requests and excuse me from having to comply with the Court's order until such time as the transcript costs can be paid.

Date: October 30, 2019
Los Angeles, California

Damon Anthony Dash

1

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------  x
EDWYNA W. BROOKS d/b/a EW BROOKS         :
BOOKS LLC,                              :
                                        :
            Plaintiff,                   :
                                        :
            -v-                          :
                                        :
DAMON ANTHONY DASH and POPPINGTON       :
LLC d/b/a DAME DASH STUDIOS,            :
                                        :
            Defendants.                  :
-------------------------------------  x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #:_____ |
| DATE FILED: _____ |

19-cv-1944 (JSR)

ORDER

JED S. RAKOFF, U.S.D.J.

On January 30, 2020, counsel for plaintiff Edwyna Brooks,

via e-mail, requested the Court to hold defendants Damon Dash

and Poppington LLC in contempt of court and to impose sanctions

in the amount of $10,000 for their violations of the stipulation

and order for a preliminary injunction effective March 19, 2019.

Under the terms of the injunction, Dash agreed not to

"market, advertise, promote, distribute, sell the film Mafietta

during the pendency of this litigation." ECF No. 23. And, at the

close of bench trial on January 23, 2020, the Court reminded the

parties that the injunction would be in effect until the Court

issues its findings of fact and conclusions of law later this

year. Despite this clear directive, defendants have, by their

own admission, failed to comply with the terms of the injunction

by not removing three Instagram posts – each dated March 5,

2017, March 8, 2017, and March 11, 2017 – promoting the film on

Poppington LLC's account. However, defendants contend this was
accidental.

Without ruling whether the violation was intentional or
accidental, the Court hereby orders defendants to remove the
said posts by no later than January 31, 2020 at 5:00 p.m. While
no sanctions will be imposed for the aforementioned violation,
failure to comply with this Order, as well as any further
knowing or reckless violation of the terms of the preliminary
injunction, will be deemed contempt of court and sanctions will
be imposed.

SO ORDERED.

Dated:    New York, NY

          January 30, 2019                    JED S. RAKOFF, U.S.D.J.
          6:45 pm. (via email)

2

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
EDWYNA W. BROOKS d/b/a EW BROOKS    :
BOOKS LLC,                          :
                                    :        19-cv-1944 (JSR)
            Plaintiff,              :
                                    :
            -v-                     :        FINDINGS OF FACT AND
                                    :        CONCLUSIONS OF LAW
DAMON ANTHONY DASH and POPPINGTON LLC :
d/b/a DAME DASH STUDIOS,            :
                                    :
            Defendants.             :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

        This copyright and trademark infringement case concerns the
film "Mafietta," which is adapted from a book series of the same
name. Plaintiff Edwyna Brooks is the author of the Mafietta book
series, and defendant Damon Dash is a movie and music producer
and the Chief Executive Officer of the co-defendant Poppington
LLC, d/b/a Dame Dash Studios. In July 2015, Brooks and Dash
started working on producing together a film version of
Mafietta, but during the course of 2015 and 2016, their
collaborative relationship fell apart. In 2017, defendants
started marketing and selling the film on iTunes and on Dame
Dash Studios' website, all without Brooks' consent.

        On February 28, 2019, Brooks brought the instant action
against defendants, claiming: (1) copyright infringement in
violation of the Copyright Act ("Count One"); (2) trademark
infringement in violation of the Lanham Act ("Count Two"); and

(3) common law trademark infringement ("Count Three"). See Pl. Ex. 1.[1] On March 19, 2019, the parties entered into a stipulated preliminary injunction, whereby defendants agreed not to market, advertise, promote, distribute, sell, or utilize the film in any fashion during the pendency of this litigation. On September 30, 2019, the Court granted summary judgment in favor of Brooks with respect to her trademark claims, but denied her motion with respect to the copyright claim as the Court found genuine disputes of material facts regarding that claim. See Memorandum Order dated 9/30/2019.

A bench trial of the copyright claim, as well as to determine damages for all three claims, commenced on January 21, 2020 and lasted for three days. The Court received 19 exhibits[2] and heard testimony from five witnesses: Brooks, Dash, Edwin Rush (attorney for Brooks in negotiating an unexecuted contract regarding the film), Eric Howard (attorney for Dash in

---

[1]    "Def. Ex." refers to defendants' trial exhibits; "Pl. Ex." refers to plaintiff's trial exhibits; "Tr." refers to the trial transcript; and "JCO" refers to the stipulated facts in the parties' joint pre-trial consent order.

[2]    During trial, defendants moved to admit Def. Ex. 15, a short video clip attached to Def. Ex. 14, an email from Brooks to Dash on May 9, 2016. See Tr. 1/23/2020, at 81:4-82:9. Brooks timely raised an objection based on relevancy, but the Court could not rule on the objection during trial as there were technological issues with playing the video. Id. After reviewing the video, the Court overrules the objection and admits Def. Ex. 15 into evidence.

negotiating the same unexecuted contract), and Alvin Williams
(damages expert for Brooks). On March 30, 2020, the parties
submitted post-trial memoranda in lieu of oral summations.

Having now carefully reviewed all of the materials, the
Court hereby grants judgment in favor of Brooks on her copyright
infringement claim, issues a permanent injunction against
defendants, and awards Brooks $300,000.00 in total damages,
based on the findings of fact and conclusions of law set forth
below. The Court's findings of fact are based on its assessment
of the evidence received at trial, including its assessment of
the credibility of the witnesses (based on their demeanor at
trial, the consistency and internal logic of their accounts, and
other pertinent factors). In particular, the Court finds
generally credible the testimony of Brooks. In contrast, even
disregarding the fact that Dash was throughout the trial
disruptive and apparently incapable of exercising ordinary
civility, the Court finds Dash's testimony to be unworthy of
belief.[3] To the extent there are conflicts between the testimony

---

[3]     To mention just a few of the many instances of Dash's
disruptive behaviors, Dash repeatedly disrupted the trial
testimony of Edwin Rush, shouting out answers to questions
directed at the witness, loudly accusing the witness of "lying,"
and repeatedly making gestures and uttering unpleasant noises.
Tr. 1/21/2020, at 51:21-52:5, 52:17-53:3. And by way of example
of Dash's gross incivility, during cross-examination, Dash
characterized plaintiff's attorney's breath as "doo-doo." Tr.
1/23/2020, at 49:23-50:2. (Dash had engaged in similar obscene

of Brooks and the testimony of other witnesses, the Court
credits the former unless otherwise noted.

## Background

Brooks, d/b/a EW Brooks LLC, is the author of a four-part
book series titled Mafietta, which is based on an aspiring
female crime boss. JCO 8-9; Tr. 1/22/2020, at 71:1-5, 19-20. Her
goal when writing the book series was to turn them into a film
or a television series. JCO 8-9. Dash is the Chief Executive
Officer of Poppington LLC, a New York limited liability company,
and ran a "Poppington seminar" designed to help and mentor
independent, aspiring entrepreneurs. JCO 9; Tr. 1/22/2020, at
156:10-157:5.

In mid-July 2015, Brooks paid $50.00 to attend a Poppington
seminar held in Albemarle, North Carolina. Tr. 1/22/2020, at

---

attacks on plaintiff's counsel during Dash's deposition. See,
e.g., id. at 50:14-24 (quoting from deposition).

Substantively, Dash was repeatedly evasive and/or
inconsistent. For example, he initially stated that he "always"
entered into a 50/50 ownership arrangement at the outset with
aspiring movie producers like Brooks, see Tr. 1/22/2020, at
156:15-17, 161:17-21, but when the Court inquired further, he
admitted that the instant project with Brooks was the "first
time" that he worked on such a project involving a movie, see
id. at 163:21-164:8. In addition, he made hyperbolic statements
such as that the Mafietta film did not reflect the script Brooks
prepared "at all" and that he "had to improvise and make up the
whole thing," which the Court finds extremely unlikely given
that the actors did table reads based on, and the script editors
worked off of, the script and rewrites that Brooks prepared. Tr.
1/22/2020, at 169:5-25; see also Tr. 1/23/2020, at 70:10-71:2.

71:21-72:1; JCO 9-10. Brooks and Dash discussed the book series Mafietta, and Brooks relayed to Dash that she had the necessary funding to shoot a movie version of Mafietta and that she needed "mentorship and a co-sign" to pursue the movie production. JOC 7; Tr. 1/22/2020, at 72:2-19. Dash agreed to provide directorial services. JOC 7; Tr. 1/22/2020, at 158:20-159, 168:21-23.

The filming began on August 3, 2015 and was completed by August 6, 2015. JCO 10; Tr. 1/22/2020, at 75:23-76:1. Prior to shooting the film, Dash, Brooks, and other actors of the film did a table read of the script that Brooks prepared and gave to Dash. Tr. 1/22/2020, at 72:20-73:3, 120:8-23. Brooks and Alicia Allen, who had been helping Brooks with adapting the book series to a film, issued rewrites of the script on the second day of the filming, and issued the final version of the script reflecting further rewrites on the last day of the filming. Pl. Ex. 19; Tr. 1/22/2020, at 74:22-75:2, 77:20-78:23, 120:24-121:9, 149:20-24. Brooks paid for the entire production cost of $49,372.34. Pl. Exs. 12, 25; Tr. 1/22/2020, at 103:23-104:4, 105:21-106:5. In exchange for 50% of net profits of the film, Dash provided his Dragon Red camera, performed the directorial services, brought in certain celebrities as key cast members – including Chandra Davis a/k/a Deelishis and Jonathan Ancrum a/k/a Murda Mook – and promoted the film afterwards. Id.; Tr.

1/22/2020, at 79:6-10, 84:22-85:6, 85:12-21, 113:18-25, 118:11-13, 119:18-23, 132:15-20; Tr. 1/23/2020, at 4:1-6, 16-20.

On July 31, 2015, before the production began, Rush, counsel for Brooks, sent an email to Dash with a draft of the Mafietta Motion Picture Director's Agreement laying out the terms of Brooks and Dash's collaboration. Tr. 1/21/2020, at 8:1-2; JCO 8; Pl. Ex. 20. After finishing the shooting, the parties continued with their postproduction work, Tr. 1/22/2020, 79:24-80:3, but their collaborative relationship fell apart as Brooks and Dash could not agree on various aspects of the production. See, e.g., Pl. Ex. 27; Tr. 1/22/2020, at 80:6-90:18. Eventually, on November 11, 2015, Rush, on behalf of Brooks, sent a draft termination and release letter to Dash for his signature, and Brooks sent an email to Craig Thieman, a film editor, directing him to cease and desist all further contact with Dash regarding the film. Pl. Ex. 5; Tr. 1/21/2020, at 23:11-14; Tr. 1/22/2020, at 88:15-90:13, 166:16-22.

In an apparent attempt to salvage the situation, the parties' respective lawyers, Rush and Howard, resumed negotiating the Mafietta Motion Picture Director's Agreement beginning on January 13, 2015. Pl. Ex. 26; Tr. 1/22/2020, at 90:14-17. On April 8, 2016, Rush sent to Howard an updated draft of the agreement incorporating various terms they had negotiated between January 13, 2015 and April 8, 2016. Pl. Ex. 26; Tr.

1/21/2020, at 16:19-23. After still further negotiations, Rush,
on October 4, 2016, sent Howard a further updated draft of the
agreement. Pl. Ex. 25. All three versions of the agreement
contained identical work-for-hire and postproduction provisions
(discussed in more detail below). Pl. Exs. 20, 25, 26. Dash,
however, signed none of these three versions, and in the end
there was no signed agreement between Brooks and Dash.[4] Tr.
1/21/2020, at 8:14-16, 11:14-15; 14:3-14, 24:10-15.

Nonetheless in February and March of 2017, the defendants
put numerous posts on the Instagram page of Dame Dash Studios
promoting the film. Pl. Ex. 11; Tr. 1/22/2020, at 92:5-97:13.
Also, in 2017, the defendants, without Brooks' consent, placed
the 17-minute version of the film on the subscription-based
platform of Dame Dash Studios[5] and on iTunes. JCO 11; Tr.
1/22/2020, at 91:25-92:11, 97:15-17. Upon discovering this,
Brooks, on December 29, 2017, reached out to iTunes, which took
down the film from its platform in late January 2018. Id.; Pl.

---

[4]    Previously, the Court determined that, under applicable New
York or North Carolina statute of frauds, there was no
enforceable oral contract pursuant to which Dash had a co-
ownership interest in net profits of the film, while clarifying
that co-ownership in net profits of the film and co-authorship
in the film are distinct concepts, where the former is an
indicium of the latter. See Memorandum Order dated 9/30/2019, at
11-16.

[5]    Dame Dash Studio offers subscription options of either
$9.99/month or $49.99/year. Pl. Ex. 6.

Ex. 1, Ex. E; see also Tr. 1/22/2020, at 97:19-100:22. On
January 27, 2019, Brooks registered the film with the U.S.
Copyright Office with the Registration No. Pau 003956394, and
brought the instant action against defendants on February 28,
2019. Pl. Exs. 1, 14; JCO 11; Tr. 1/22/2020, at 107:10-20,
143:7-17.

## Claim for Copyright Infringement

In order to establish copyright infringement, plaintiff
must show "(1) ownership of a valid copyright, and (2) copying
of constituent elements of the work that are original." Feist
Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).[6]
There is no dispute that Brooks owns a valid copyright over the
film Mafietta: in January 2019, Brooks registered the film with
the U.S. Copyright Office. Pl. Ex. 14; see also Fonar Corp. v.
Domenick, 105 F.3d 99, 104 (2d Cir. 1997) ("A certificate of
copyright registration is prima facie evidence that the
copyright is valid."). Furthermore, there is no dispute that
defendants "copied" – defined to include reproduction and
distribution – the film Mafietta. See Arista Records LLC v. Doe,
604 F.3d 110, 117 (2d Cir. 2010).

---

[6]      Unless otherwise indicated, in quoting cases all internal
quotation marks, alterations, emphases, footnotes, and citations
are omitted.

Defendants' defense is that Dash co-owned the copyright in the film Mafietta, in which case Dash cannot be held liable. In the Second Circuit, when there is no written contract to address co-authorship (as is the case here), two or more contributors to a work are considered "joint authors" if each "(1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." Thomson v. Larson, 147 F.3d 195, 200 (2d Cir. 1998). In its summary judgment order, the Court already determined that Dash has made independently copyrightable contributions to the film Mafietta. See Memorandum Order dated 9/30/2019, at 10. Therefore, the only issue at trial with respect to the liability portion of Count One was whether Brooks and Dash fully intended to be co-authors.

The Second Circuit has declined to define explicitly what kinds of proof are necessary to show such joint intent, because the test of co-authorship depends on specific factual circumstances. Nevertheless, a "specific finding of mutual intent [is] necessary," and, to assess this determination, courts have typically considered such factors, inter alia, as whether the parties intended to be credited or billed as co-authors, the parties' view of decision-making and creative control, and the right to enter into third party contracts. Thomson v. Larson, 147 F.3d 195, 202-04 (2d Cir. 1998).

-9-

Here, the Court finds that Brooks and Dash did not ever intend to be co-authors. To begin with, the Court credits the testimony of Brooks and Rush that Dash was employed under the doctrine of work for hire and that it was never intended that he be a co-author of the film. See generally Tr. 1/21/2020 at 9:18-23:20; Tr. 1/22/2020, at 79:6-152:19. Documentary evidence introduced at trial corroborates this assertion. For instance, although the Mafietta Motion Picture Director's Agreement was never executed, all three drafts – dated July 30, 2015, April 8, 2016, and October 4, 2016, respectively – contained the following identical work-for-hire provision:

> Director's [(i.e., Dash's)] performance hereunder, including all suggestions, ideas, or screen business contributed to the screenplay or to the Film as made will be as an employee for hire, with the resulting film to be deemed a work made for hire as defined in the United States Copyright Act, and Producer [(i.e., Brooks)], or its designee, will be deemed the sole author thereof. Moreover, Director waives any so-called author's rights or droit moral that may accrue under any law throughout the world based on or deriving from his contributions to the Film.

Pl. Exs. 20, 26, 25. All three versions also contained the following identical postproduction clause:

> Director will have the right to consult with Producer during postproduction of the motion picture, and Director will be available for consultation, but Producer will have the right to make all final decisions with respect to editing and postproduction work, release, and exploitation of the motion picture.

The fact that Dash and his counsel never objected to these provisions from July 30, 2015 through at least October 4, 2016 – while other provisions regarding reimbursement, merchandise, additional filming, additional investment, producer's credit, and more were actively revised during the negotiation process – strongly supports the finding that the parties did not intend Dash to be a co-author of the film. See Pl. Exs. 26, 25; Tr. 1/21/2020, at 12:16-13:2, 23:17-20; Tr. 1/22/2020, at 184:20-25, 187:24-189:19, 200:13-15, 201:16-18, 202:9-14.

Furthermore, in an email to Dash on September 22, 2015, Brooks wrote:

> I need to know that the 'Mafietta' brand is in tact [sic] as it was when I brought it to you. This is about women's empowerment at the end of the day. . . . I can't have you take it so far left or right that I don't recognize it. For that reason, I am not offering creative control. I am offering a chance for you to bring an edit to the table . . . I will maintain final approval.
>
> I have no issue with paying out the 50% we discussed. However, I have a big issue with the word OWN as the book, sizzle, and script were complete when I met you.

Pl. Ex. 27. This email shows Brooks' clear intent to deny sharing any creative control with Dash. See also Tr. 1/22/2020, at 79:14-16.

-11-

In contrast, although Dash and Howard testified that the parties intended Dash to be a co-author,[7] their self-serving testimony not only lacked credibility but also was not corroborated by a single piece of documentary evidence. See generally Tr. 1/22/2020, at 160:15-164:9, 167:11-25, 180:23-190:9; Tr. 1/23/2020, at 16:12-14. Rather, they could only point to documentary evidence showing that Brooks and Dash intended the profits to be split 50/50 (which is not contested), rather than that Brooks and Dash intended to co-own the copyright. Tr. 1/22/2020, at 185:23-186:9; Tr. 1/23/2020, at 23:1-8; Pl. Ex. 26; see also Tr. 1/21/2020, at 17:5-17. In fact, Dash admitted at one point that the word "copyright" "never came up" between him and Brooks, and he did not seem to demonstrate any understanding of the difference between ownership interest in profits and ownership interest in copyright. Tr. 1/23/2020, at 23:6-8, 29:21-30:2, 33:18-23.

---

[7]     After the close of evidence, Brooks made a Fed. R. Civ. P. 50 motion for judgment as a matter of law, arguing that a reasonable jury would not have a legally sufficient evidentiary basis to find for Dash on whether the parties intended Dash to be a co-author of the film. Tr. 1/23/2020, at 86:20-88:19. As this was bench trial, the motion should have been made pursuant to Fed. R. Civ. P. 52, rather than Fed. R. Civ. P. 50. Even assuming Brooks made the motion properly under Fed. R. Civ. P. 52, the Court hereby denies the motion, as this testimony by Dash and Howard provided some evidentiary basis – although the Court, as a fact finder, eventually found their testimony not credible – that the parties intended Dash to be a co-author.

For the foreging reasons, the Court finds that the parties did not mutually intend Dash to be a co-author of the film and therefore Dash did not co-own the copyright in the film. The Court further finds that Brooks was the dominant author between the two.[8] See 16 Casa Duse, LLC v. Merkin, No. 12-cv-3492 (RJS), 2013 WL 5510770, at *9 (S.D.N.Y. Sept. 27, 2013), aff'd in part, rev'd in part on other grounds, 791 F.3d 247 (2d Cir. 2015) ("When the Second Circuit finds that there is no mutual intent to be co-authors, it holds that whoever was the 'dominant' author is the sole author."). Accordingly, the Court concludes that defendants infringed Brooks' copyright by reproducing and distributing the film on iTunes and Dame Dash Studios without her permission.

### Remedies and Damages

---

[8]    As discussed above, Brooks was the author of the book series that was turned into the film, paid for the entire production and post-production, paid the actors, provided the scripts and re-writes, and so forth. Pl. Exs 12, 19, 25; Tr. 1/22/2020, at 71:1-5, 19-20, 74:22-75:2, 77:20-78:23, 103:23-104:4, 105:21-106:5, 120:24-121:9, 149:20-24; JCO 8-9. Furthermore, the documentary evidence discussed above also strongly supports finding Brooks to be the dominant author. Tellingly, Dash did not even recognize almost all of the crew who were working on shooting the film. Tr. 1/23/2020, at 59:24-60:22. In addition, as discussed above, the Court entirely discredits Dash's hyperbolic statements that the film did not reflect the script Brooks prepared "at all" and that he "had to improvise and make up the whole thing." Tr. 1/22/2020, at 169:5-25; see also Tr. 1/23/2020, at 70:10-71:2.

Given that defendants are liable to Brooks on the claims for copyright infringement and trademark infringement, the Court hereby issues a permanent injunction enjoining defendants, and each of them, from marketing, advertising, promoting, distributing, selling, or copying the film Mafietta without Brooks' consent. See 17 U.S.C. § 502(a); 15 U.S.C. § 1116(a).

In addition to injunctive relief, Brooks seeks the following monetary damages: (1) $557,372.84 for copyright infringement (consisting of $49,372.84 for the cost of producing the film, $8,000.00 for the cost of marketing, and $500,000.00 for future income loss), (2) $557,372.84 for trademark infringement (consisting of the same), (3) $375,500.00 in discretionary damages relating to infringement, (4) costs and attorney's fees, and (5) treble damages.[9] The Court concludes, however, that only damages in the total amount of $300,000.00 are warranted, for the following reasons.

Damages Under Count One. Under the Copyright Act, Brooks may elect to seek either actual damages and profits or statutory damages, and Brooks elected the former at the end of the trial. 17 U.S.C. § 504(c)(1); Tr. 1/23/2020, at 86:16-19. The relevant

---

[9]     In contrast, in the joint pre-trial consent order, she sought, without distinguishing damages under the copyright claim from those under the trademark claims: (1) $49,372.84 for the cost of producing the film, (2) $500,000.00 for future income loss, (3) attorney's fees, and (4) treble damages.

statutory provision states: "The copyright owner is entitled to
recover the actual damages suffered by him or her as a result of
the infringement, and any profits of the infringer that are
attributable to the infringement and are not taken into account
in computing the actual damages. . . ." 17 U.S.C. § 504(b).
Here, as noted, Brooks seeks recovery based on actual damages
(including loss of future income) suffered by her, rather than
defendants' profits.[10]

In assessing actual damages she suffered, the Court makes
the following findings of fact. In 2016, Brooks submitted the
film to an international film festival held in Nashville, TN,
where the film won an award. Tr. 1/22/2020, at 104:9-11, 146:15-
19. However, once defendants placed the film on Dame Dash
Studios and iTunes in 2017, which constituted a commercial
release, the film no longer became eligible for submissions to
many other film festivals, effectively eliminating any chance of
further marketing of the film through festivals. Id.; id. at
147:4-12; Tr. 1/21/2020, at 38:12-39:3, 46:4-16. Also, placement
of the film on commercial platforms, as well as the dispute over

---

[10]   Except for defendants' advertisement revenue figures from
the first quarter of 2017 to May 2019 associated with the
Mafietta trailer placed on YouTube, no evidence was presented
during trial regarding how much profit defendants made from
streaming the film on iTunes or Dame Dash Studios, other than
Dash's self-serving testimony that there was no revenue from
iTunes or Dame Dash Studios associated with the film. Tr.
1/23/2020, at 20:19-22:25, 25:23-26:12, 51:17; Def. Ex. 32.

the chain of title, largely erased the possibility that the film would be acquired by a media platform. Id.; id. at 39:4-19; Tr. 1/22/2020, at 104:1-9, 138:5-11, 139:2-8; Pl. Ex. 16.

The Court finds that Brooks thereby lost approximately $300,000.00 in potential future income as a result of defendants' infringing conduct. According to the expert testimony by Williams,[11] the 17-minute film could have been transformed into a TV series or a back-door pilot. Pl. Ex. 16; see generally Tr. 1/21/2020, at 34:11-62:16. Mafietta could well have been acquired as such by cable networks or streamlining video on-demand services ("SVODs"), given that there have been high demands for organized crime TV series and series produced by, written by, and starring people of color. Id. Furthermore, the cast for the film involved an identifiable female talent with a solid fan base – with over two million followers on her Instagram account – and a male lead with a strong underground hip hop fan base. Id. If the 17-minute film had been acquired as

---

[11]   During trial, defendants objected to the admissibility of Williams as an expert witness, on the ground that Williams was allegedly not an expert in film and sale acquisition. See Tr. 1/21/2020, at 32:22-33:19. The Court reserved its decision. See id. After examining all relevant evidence - including Williams' resume and his testimony, all of which show his expertise and experience in acquisition of films for distribution as well as licensing films for various media platforms - the Court hereby overrules the objection to the admissibility of Williams as an expert witness. See, e.g., Pl. Ex. 16; Tr. 1/21/2020, at 31:2-32:5, 41:3-42:9. It also finds his testimony credible.

such by cable networks, each episode would have had a production budget from $50,000.00 to $250,000.00 per episode, and possibly higher if acquired by premium pay channels or SVODs, id., thus implicitly reflecting the potential profitability of the series.[12]

For damages calculation, Williams assumed that ten episodes would be produced based on the 17-minute version of the film, but he provided no explanation as to how he arrived at the ten episode figure. Pl. Ex. 16; Tr. 1/21/2020, at 58:12-15; see also id. at 39:20-40:3. However, he testified that typically networks would make a minimum of six episodes, because they need at least six episodes to qualify for an Emmy Award. Tr. 1/21/2020 at 37:17-23. Therefore, the Court finds that conservatively six episodes would have come out of this film, and thus finds that Brooks lost about $300,000.00 in future income.

While Brooks is therefore entitled to $300,000.00 in actual damages for lost income, she is not entitled to damages for the costs of producing and marketing the film in the amount of, respectively, $49,372.84 and $8,000.00,[13] because she would have

---

[12] Any cost associated with marketing the show or back-door pilot – conservatively, at least $200,000.00 according to Williams' testimony, Tr. 1/21/2020, at 50:22-51:12 – would be borne by the network, rather than by Brooks. Id. at 60:20-61:11.

[13] In her post-trial closing memorandum, Brooks asserts for the first time that she is entitled to $8,000.00 in relation to

-17-

spent those amounts regardless of whether defendants
subsequently infringed her copyright. Moreover, Brooks has not
put forth any reason why treble damages are warranted, nor does
the Court find a reason to award treble damages. While Dash may
be a difficult and intemperate person, and one lacking in
credibility, there is no evidence that he entered into this
arrangement for the purpose of committing a blatant fraud.
Lastly, under the relevant statutory provisions, Brooks is not
entitled to attorneys' fees, because the infringement at issue
started before the registration of her copyright.[14] 17 U.S.C. §

---

marketing the film after it was produced, based on her testimony
during trial. See Plaintiff's Post-Trial Memorandum, ECF No. 64,
at 12; Tr. 1/22/2020, at 126:17-23.

[14]     After the close of evidence, defendants made a motion for
judgment on the merits regarding damages under Count One,
arguing that there was no evidence that Brooks' copyright was
infringed after it was registered in January 21, 2019. Tr.
1/23/2020, at 89:18-90:9. The motion is granted with respect to
the issue of whether Brooks is entitled to attorney's fees as
discussed above, but denied in all respects. Although
registration of a work with the Copyright Office is a
precondition to filing a suit for infringement under the
Copyright Act, see 17 U.S.C. § 411(a), such registration "is not
a condition of copyright protection." 17 U.S.C. § 408(a); see
also Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp., 210 F. Supp.
2d 147, 157 (E.D.N.Y. 2002), aff'd sub nom., 354 F.3d 112 (2d
Cir. 2003). However, plaintiff may not recover statutory damages
and attorneys' fees for infringement that occurred before
registration. See 17 U.S.C. § 412; Argentto Sys., Inc. v. Subin
Assocs., LLP, No. 10-cv-8174 (RWS), 2011 WL 2534896, at *2
(S.D.N.Y. June 24, 2011). Therefore, Brooks is not entitled to
attorneys' fees related to the copyright infringement claim, but
she properly seeks actual damages for pre-registration
infringement. See also Renna v. Queens Ledger/Greenpoint Star

---

-18-

412; _see also_ _Ez-Tixz, Inc. v. Hit-Tix, Inc._, 919 F. Supp. 728,
735-36 (S.D.N.Y. 1996).

Damages Under Counts Two (and Three[15]). Under the Lanham
Act, Brooks is entitled to recover "(1) defendant's profits, (2)
any damages sustained by the plaintiff, and (3) the costs of the
action." 15 U.S.C. § 1117(a). As discussed above, Brooks seeks
actual damages she suffered, rather than defendants' profits. To
the extent these are based on her lost future income that would
have resulted from turning the film into a TV series, the
damages sought under Counts Two and Three are duplicative of the
damages awarded under Count One. Otherwise, Brooks puts forth no
evidence that her Mafietta mark and brand were harmed or
tarnished by defendants' infringing activities (_e.g._, evidence
showing a decrease in her book sale revenue). Furthermore, she
is not entitled to additional $375,000.00 in discretionary
damages, as the Court does not find that the amount of the
recovery in the amount of $300,000.00 is inadequate. _See_ 15
U.S.C. § 1117(a).

---

Inc., No. 17-cv-3378 (DRH) (SIL), 2019 WL 1061259, at *4
(E.D.N.Y. Feb. 13, 2019), report and recommendation adopted,
2019 WL 1062490 (E.D.N.Y. Mar. 6, 2019).

[15]    During trial, plaintiff conceded that the claim for common
law trademark infringement (Count Three) should, for damage
calculation purposes, be dismissed as being duplicative of the
claim for trademark infringement in violation of the Lanham Act
(Count Two). _See_ Tr. 1/21/2020, at 63:11-64:10.

Lastly, this is not an "exceptional case" warranting an award of attorney's fees under the claims for trademark infringement. Under the Lanham Act, the Court may award, in "exceptional cases," reasonable attorney fees to the prevailing party. 15 U.S.C. § 1117(a). Based on the totality of circumstances, the Court does not find "there is an unusual discrepancy in the merits of the positions taken by the parties" with respect to the claims for trademark infringement, as exemplified by the arguably colorable, albeit ultimately defeated, argument raised by defendants during this action that Brooks had acquiesced to defendants' use of the trademark at issue. Georgia-Pacific Consumer Products v. Von Drehle, 781 F.3d 710 (4th Cir. 2015); see also Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S. Ct. 1749 (2014). Nor did defendants "litigate[] the case in an unreasonable manner" with respect to the claims for trademark infringement. Id.

In sum, the Court concludes that no additional damages are warranted under the trademark claims on top of damages awarded under the copyright claim.

## Conclusion

The Clerk is directed to enter final judgment in favor of plaintiff Edwyna Brooks, and against both defendants, jointly and severally, in the amount of $300,000.00, plus post-judgment interest at a rate of 0.22% per annum accruing from the date

-20-

hereof, <u>see</u> 28 U.S.C. § 1961, and to close the case.
Furthermore, defendants are permanently enjoined from marketing,
advertising, promoting, distributing, selling, or copying the
film without Brooks' consent.

     SO ORDERED.

Dated:    New York, NY
         April 13, 2020

                                     JED S. RAKOFF, U.S.D.J.

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
EDWYNA W. BROOKS d/b/a EW BROOKS         :
BOOKS LLC,                              :
                                       :
          Plaintiff,                   :
                                       :           19-cv-1944(JSR)
          -v-                          :
                                       :           MEMORANDUM ORDER
                                       :
DAMON ANTHONY DASH and POPPINGTON LLC   :
d/b/a DAME DASH STUDIOS,                :
                                       :
          Defendants.                  :
------------------------------------ x
JED S. RAKOFF, U.S.D.J.

    Familiarity with the background to this copyright and
trademark infringement case is here assumed. As relevant here,
the Court held a three-day bench trial starting on January 21,
2020, and issued its Findings of Fact and Conclusions of Law on
April 13, 2020. See ECF No. 71. Accordingly, the Clerk of the
Court, on April 15, 2020, entered final judgment in favor of
plaintiff Edwyna Brooks, and against defendants Damon Dash and
Poppington LLC, jointly and severally, in the amount of
$300,000.00, plus post-judgment interest at a rate of 0.22% per
annum accruing from April 15, 2020.[1] See ECF No. 72.
Subsequently, on May 5, 2020, defendants filed a notice of
appeal to the U.S. Court of Appeals for the Second Circuit. See
ECF No. 75.

---

[1] In addition, defendants were permanently enjoined from
marketing, advertising, promoting, distributing, selling, or
copying the film "Mafietta" without Brooks' consent.

Now before the Court is a motion of defendants for a discretionary stay of enforcement and execution of the final judgment without a bond or other security pursuant to Fed. R. Civ. P. 62(b). See ECF No. 76. Alternatively, defendants ask that, if that request is denied, the Court grant a two-week extension of the 30-day automatic stay under Fed. R. Civ. P. 62(a), so that defendants can secure a supersedeas bond to move for a stay pursuant to Fed. R. Civ. P. 62(b).[2] See Declaration in Support, ECF No. 76-1 ("Defendants Mem."), at 1 n.1. Plaintiff opposes the main request but does not address the alternative request to obtain a two-week extension. See Memorandum of Law in Opposition to Notice to Stay Execution, ECF No. 77. For the reasons set forth below, the Court denies the request to stay enforcement without posting any bond, but grants a two-week extension of the automatic stay.

Under Fed. R. Civ. P. 62(a), "execution on a judgment and proceedings to enforce it are stayed for 30 days after its entry, unless the court orders otherwise." In addition, under Fed. R. Civ. P. 62(b), "a party may obtain a [further] stay by providing a bond or other security. The stay takes effect when

---

[2] As represented to the Court in their brief and during a joint telephonic conference held on May 13, 2020, defendants are currently endeavoring to secure a supersedeas bond in the amount of the judgment.

2

the court approves the bond or other security and remains in effect for the time specified in the bond or other security."

The purpose of Fed. R. Civ. P. 62(b) is to ensure "that the prevailing party will recover in full, if the decision should be affirmed, while protecting the other side against the risk that payment cannot be recouped if the decision should be reversed." Cleveland Hair Clinic, Inc. v. Puig, 104 F.3d 123, 125 (7th Cir. 1997).[3] However, the Court "may, in its discretion, waive the bond requirement if the appellant provides an acceptable alternative means of securing the judgment." In re Nassau County Strip Search Cases, 783 F.3d 414, 417 (2d Cir. 2015) (per curiam).

The Second Circuit adopted the following as non-exclusive factors for district courts to consider in determining whether to waive the supersedeas bond requirement:

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would

---

[3] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

place other creditors of the defendant in an insecure
position.

Id. at 417-18.

Here, with the possible exception of the second factor, all
factors strongly weigh in favor of denying the request.

With respect to the first, third, fourth, and fifth
factors, defendants argue that they can easily satisfy the
judgment because Poppington LLC's annual net income exceeds the
amount of the judgment and because Poppington LLC allegedly does
not have any known secured creditors. See Defendants Mem. 3. But
this statement is flatly contradicted by the representations the
defendants have repeatedly made to the Court in the past half
year that defendants – both Dash and Poppington LLC - have not
had, and do not have, the means to pay even the mere $2,410.75
owed to plaintiff's counsel in deposition costs as previously
ordered by the Court. See ECF Nos. 49, 57, 73. For example,
Dash, on October 30, 2019, submitted a declaration under penalty
of perjury under the laws of the United States and California
explaining why both he and Poppington LLC could not afford to
pay the $2,410.75. See ECF No. 58. In light of these prior
representations, and defendants' continued nonpayment of even
the $2,410.75, the Court has no confidence in defendants'
ability (or willingness) to pay the judgment and is confident

4

that the collection process for plaintiff will be challenging and complex if the judgment is affirmed on appeal.

In sum, virtually all the relevant factors strongly favor denying the request under Fed. R. Civ. P. 62(b) for a discretionary stay of enforcement and execution of the final judgment without a bond or other security. However, while the Court is likewise skeptical that defendants will be able to obtain a supersedeas bond in the amount of the judgment, nevertheless, since plaintiff has not argued for denial of this request, the Court grants an extension of the automatic stay under Fed. R. Civ. P. 62(a) until May 29, 2020. No further extension will be granted, however, for any reason, and, if defendants wish to make a Fed. R. Civ. P. 62(b) motion for bond approval, they must make such a motion sufficiently prior to May 29, 2020 so that the Court can rule on the motion before the expiration of the stay on May 29, 2020.

The Clerk of the Court is directed to close the entry bearing docket number 76.

SO ORDERED.

Dated:      New York, NY
            May 16, 2020

JED S. RAKOFF, U.S.D.J.

# EXHIBIT H

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MONIQUE BUNN,

                     Plaintiff,

      v.

DAMON ANTHONY DASH, et al.,

                  Defendants.

)
)
)
)
)
)
)
)
)
)
)

Case No. CV 20-7389-DMG (JCx)

**ORDER RE PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [119]**

Before the Court is Plaintiff Monique Bunn's Motion for Partial Summary Judgment. [Doc. # 119 ("MSJ").] The MSJ is fully briefed. [Doc. ## 123 ("Opp."), 124 ("Reply").] For the following reasons, the Court **GRANTS in part** and **DENIES in part** Bunn's MSJ.

## I.

## PROCEDURAL BACKGROUND

Bunn initiated this action on December 26, 2019 in the Southern District of New York. [Doc. # 1.] She filed the operative First Amended Complaint ("FAC") on April 23, 2020 against Defendants Damon Dash, Damon Dash Studios ("DDS"), Poppington LLC, and Raquel Horn. [Doc. # 49.] The FAC alleges claims for sexual battery against Dash,

-1-

negligence against Poppington and DDS, and conversion and negligent infliction of emotional distress against all Defendants.  The action was transferred to this Court on August 10, 2020.  [Doc. # 68].

Bunn filed the instant MSJ on March 31, 2021, seeking summary judgment only on her conversion claim against all Defendants.

## II.

## FACTUAL BACKGROUND[1]

Bunn is a photographer in the entertainment industry and resides in Pennsylvania. Bunn Decl. ¶¶ 1-2 [Doc. # 121].  Dash and Horn together operate a production studio in Sherman Oaks, California through Poppington, their limited liability company.  SUF 3, 10[2]; Dash Decl. ¶ 2 [Doc. # 123-3][3]; Horn Decl. ¶¶ 2-3 [Doc. # 123-4].[4]

---

[1] The Court discusses only those facts relevant to the conversion claim, the only claim at issue in this motion.  The facts are uncontroverted unless otherwise noted.  The Court will address the parties' evidentiary objections as they arise in the discussion.  To the extent any objected-to evidence is not discussed, the objections are **OVERRULED** as moot.

[2] The Court refers to the document containing Defendants' responses for Plaintiff's Statement of Undisputed Facts ("SUF").  [*See* Doc. # 123-1].

[3] Dash claims in his declaration that he is "neither a member nor the Chief Executive Officer of Poppington, LLC."  Dash Decl. ¶ 3.  In the immediately preceding paragraph, however, he says, "I have a separate, limited liability company" with the same address that he does not dispute belongs to Poppington.  *Id.* ¶ 2.  He also previously testified in a separate trial to owning Poppington, and is listed on Poppington's corporate filing with the California Secretary of State as its CEO.  *See* Brown Decl. ¶ 2, Ex. 1 at 24; *id.* at ¶ 4, Ex. 3 [Doc. # 124-1].  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[4] Bunn does not define DDS's status in her moving papers, other than to refer to the studios as belonging to "Poppington/DDS."  *See, e.g.*, SUF 10.  In the FAC, she alleges that DDS is an alter ego of Dash and is not incorporated nor is it a limited liability company or limited liability partnership.  FAC ¶ 5.  In their Answer, Defendants deny the existence of DDS as an entity.  Answer ¶ 6 [Doc. # 79].  Since the parties appear to agree that DDS is not an independent legal entity, summary judgment against it is **DENIED** and the Court *sua sponte* **DISMISSES** it from this action.

In April 2019, Dash and Horn invited Bunn to come to Los Angeles for a photography shoot and asked her to bring a collection of her past photographs. Bunn Decl. ¶ 3. Bunn arrived in Los Angeles on April 18, 2019. *Id.* ¶ 5. After briefly visiting Dash and Horn at their home,[5] Bunn went with them to the Poppington studio. *Id.* at ¶ 6. She brought with her a host of personal items, including two laptop computers, photography equipment, and CDs and hard drives that collectively contained over 100,000 photographs. *Id.* at ¶¶ 7, 16-17. After a few hours at the studio, the three returned to Dash's residence, where Bunn would be staying during her time in Los Angeles. *Id.* ¶ 8. Bunn left her belongings behind at the studio in a locked office space provided by Dash and Horn. *Id.*

The next day, according to Bunn, it was agreed that Bunn needed to purchase additional equipment to complete the photo shoot. *Id.* at ¶ 9. Dash and Horn gave her Poppington's credit card and had their driver take Bunn to the Apple store, where she purchased approximately $3,000 worth of equipment. *Id.* at ¶ 10. According to Bunn, Horn was unhappy with the cost of the purchase and became upset. *Id.* at ¶ 11. On the evening of April 20, 2019, Dash and Horn kicked her out of the house and sent her to a hotel. She asked them if she could return to the studio to retrieve her belongings, but they refused. *Id.* at ¶ 12. They assured her that they would send her belongings to her the following week. *Id.* at ¶ 13.

According to Dash, Bunn made unauthorized purchases on the Poppington card and then was caught trying to steal the purchased items, which is why Dash and Horn asked her to leave. Dash Decl. ¶ 7. Dash acknowledges that he told Bunn he would make arrangements to have her belongings returned to her. *Id.* at ¶ 8.

On April 29, 2019, Bunn texted Dash requesting that her belongings be returned, but he did not respond. Bunn Decl. ¶ 14, Ex. 1.

---

[5] Bunn suggests, and Defendants do not dispute, that Dash and Horn live together and are romantic partners as well as business partners. *See* Bunn Decl. ¶¶ 4, 6.

-3-

## III.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir.

## IV.

## DISCUSSION

"Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015). The parties do not dispute the first element, that Bunn owned the property at issue. The Court therefore addresses only the other two elements.

-4-

## A.     Wrongful Act or Disposition of Property

A defendant wrongfully dispossesses a plaintiff of her property if he knowingly or intentionally substantially interferes with it by *either* (1) taking possession of it, (2) preventing the plaintiff from accessing it, (3) destroying it, or (4) refusing to return it after the plaintiff demands its return.  California Civil Jury Instructions No. 2100.  Property obtained lawfully can nonetheless be converted if the defendant refuses to turn over possession upon demand.  *Cerra v. Blackstone*, 172 Cal. App. 3d 604, 609 (1985).

Here, it is uncontroverted that Defendants had possession of Bunn's property, asked her to leave while assuring they would ship her belongings to her, then failed to do so upon Bunn's request.  Defendants quibble with some extraneous details, *see* Opp. at 11-12,[6] but they do not actually dispute this basic premise.  Dash and Horn both state in their declarations, "At no time did I [or Poppington][7] refuse to permit Ms. Bunn to retrieve her items."  Dash Decl. ¶ 8; Bunn Decl. ¶ 4.  But this blanket statement does not genuinely controvert the fact that they assured Bunn they would return her items, then did not do so, even after she followed up.  Even if Bunn could have gone straight to the studio to collect her items after being asked to leave Dash's house—viewing the facts in the light most favorable to Defendants—she relied upon their promise that they would ship the items to her.  Perhaps at the moment Bunn left town, Defendants had not yet dispossessed Bunn of the property.  But when she demanded its return a week later, as she was promised, and Defendants failed to do so, they dispossessed her of her belongings.  Their failure need not have been an affirmative act, nor was Bunn required to attempt to retrieve the property herself after asking for its return, in order establish a conversion claim.  *See Schroeder v. Auto Driveaway Co.*, 11 Cal. 3d 908, 918 (1974) ("Where B is in possession of the property

---

[6] All page references herein are to the page numbers inserted by the CM/ECF system.

[7] Horn's declaration adds "or Poppington"—otherwise, the two statements are identical.

. . . and A demands it, and B fails to deliver it, no modern court is going to save B from being a converter on the ground that there was only a nonfeasance.") (citation omitted).

Dash and Horn attest that they made efforts to return Bunn's property through their counsel, and Defendants' counsel attempts to introduce evidence of his negotiations with Bunn's counsel after the litigation was filed surrounding the property's return.  Dash Decl. ¶ 8; Horn Decl. ¶ 4; Traylor Decl. ¶¶ 2-3, Ex. A [Doc. # 123-5].  Bunn objects to this evidence as violative of Federal Rule of Evidence 408, which makes inadmissible evidence of settlement negotiations to prove or disprove the validity or amount of a claim.  The objection is **OVERRULED as moot**.  Even if the evidence were considered, the fact that Defendants made offers to return the property months later is immaterial.  The dispossession of property need not be permanent to constitute conversion.  *See Enter. Leasing Corp. v. Shugart Corp.*, 231 Cal. App. 3d 737, 748 (1991) ("[T]the fact that plaintiff regained possession of the converted property does not prevent him from suing for damages for the conversion.").

Finally, Defendants argue that Bunn has not established liability against each and all particular Defendants.  Opp. at 14.  The Court disagrees.  It is uncontroverted that Dash and Horn together invited Bunn to the studio owned by their LLC.  Bunn left her items in a locked room on property belonging to Poppington.  Dash and Horn then jointly demanded that Bunn leave their house, while promising they would ship her items to her, which they did not do.  These facts are sufficient to make Dash, Horn, and their corporation, Poppington, jointly and severally liable for conversion.  *McCafferty v. Gilbank*, 249 Cal. App. 2d 569, 576 (1967) ("Where the conversion is the result of the acts of several persons, which, though separately committed, all tend to the same end, there is a joint conversion.") (citation omitted).

In sum, it is uncontroverted that Dash, Horn, and Poppington each participated in obtaining Bunn's property and then failed to return it upon request.  This conduct satisfies the disposition element of the conversion claim.

**B.     Damages**

Bunn claims that her conversion claim is worth $50,026,000.  She reaches this sum by asserting that each of the 100,000 photographs contained in her hard drives is worth $500 a piece, and that the photography equipment and other items are worth approximately $26,000.  *See* MSJ at 8-9.

As for the photographs, Bunn bases their valuation on a judgment she earned for her work in a 2000 lawsuit in the New York Supreme Court, *Bunn v. Bad Boy Entertainment Inc., et al.*, Case No. 103952/99, where the court awarded her $500 each for 80 photography slides.  *See* Bunn Decl. ¶ 18, Ex. 2.  In that case, the defendant lost the slides, and the parties had an agreement that there would be a charge of $500 per slide if any were lost.  *Id.* at 3-4.  The 80 slides had been selected as the best photographs from a photography session.  *Id.* at 3.

The situation is completely different here.  The 100,000 photographs are not a preselected "best"—they are Bunn's entire catalog.  There is no agreement between Bunn and Defendants over the value of the photographs.  That Bunn was able to sell some of her photographs for $500 does not mean that all photographs she ever took are worth $500.  Some could be worth more, and likely many are worth less.

As for the physical items, Bunn simply speculates that they are worth $26,000.  She lists a couple dozen items in exceedingly generic terms (*e.g.*, "PC laptop," "zoom lens," and "diamond earrings"), without providing brands, models, dates of purchase, or individual purchase prices.  *See* Bunn Decl. ¶ 7.  She provides some pictures of the items, which are also not very helpful in terms of assessing a value.  *Id.* at ¶ 27.

The usual presumed measure of damages in a conversion claim is the fair market value of the converted property.  *Lueter v. State of California*, 94 Cal. App. 4th 1285, 1302 (2002).  Bunn has not established the fair market value of her converted property.

# V.

## CONCLUSION

In light of the foregoing, Bunn's MSJ is **GRANTED in part** and **DENIED in part**. On the first two elements of her conversion claim—her right to possession and Defendants' wrongful disposition of the property—the Court **GRANTS** summary adjudication in Bunn's favor. On the element of damages, Bunn's MSJ is **DENIED**. A triable issue remains as to the amount of damages Bunn is entitled from her claim.

The Court finds Bunn's MSJ appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Therefore, the April 30, 2021 hearing is **VACATED**. **IT IS SO ORDERED.**

DATED: April 28, 2021

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

# EXHIBIT I

ADVERTISEMENT



Privacy Policy | Feedback   Follow 20.8M

Friday, Jul 2nd 2021  7AM 64°F  10AM 65°F  5-Day Forecast

# Daily mail
.com

TV&Showbiz

| Home | U.K. | News | Sports | U.S. Showbiz | Australia | Femail | Health | Science | Money | Video | Travel | Shop | DailyMailTV |

| Latest Headlines | Friends Reunion | Kim Kardashian | Billie Eilish | Bridgerton | Taylor Swift | U.K. Showbiz | Headlines | Video | Games | Login |

Site ○ Web    Enter your search    Search

# Damon Dash arrested after getting $400K behind in child support payments to ex-wife Rachel Roy and ex Cindy Morales ... as music mogul claims he's penniless

- **Dash, 48, was handcuffed and taken to Bronx Family Court on Wednesday**
- **Warrant was issued in April of 2015 over $62,000 he owed Morales**
- **The music mogul was married to fashion designer Roy, 45, from 2005 to 2009 and has two daughters with her - Ava, 19, and Tallulah, 11**
- **Dash said deputies were very understanding and cooperative throughout the process**
- **Dash is currently expecting another child with fiancee Raquel Horn**
- **Dash co-founded Roc-A-Fella Records along with Jay-Z**

By ADAM S. LEVY FOR DAILYMAIL.COM
PUBLISHED: 19:17 EDT, 20 November 2019 | UPDATED: 09:25 EDT, 21 November 2019

 Share        **129** shares    **20** View comments

Damon Dash was arrested in connection with $404,000 in unpaid child support to ex-wife Rachel Roy and ex-girlfriend Cindy Morales on Wednesday in his native **New York City**.

Dash, 48, was handcuffed and taken to Bronx Family Court amid a pair of felony warrants, the New York City Sheriff's Office told **Page Six**.

Sheriff Joseph Fucito said authorities had been 'looking to arrest [Dash] since 2015,' as a warrant was issued in April of that year over $62,000 he owed Morales.

Earlier this year, another warrant was issued over a contempt of court conviction, with the court ordering him to pay an additional $342,000.





Follow Daily Mail Celeb
Follow Daily Mail Celeb
Follow @DailyMail
Follow Daily Mail Celeb
Follow @DailyMailCeleb
Follow Daily Mail

**FEMAIL TODAY**


Mark Wahlberg calls wife Rhea a 'total smokeshow' as he shares bikini photos to celebrate her 43rd birthday


Adam Demos' hometown friends come forward to reveal the TRUTH about his sizeable manhood after he stripped naked for racy Netflix series Sex/Life


Lil' Kim hits back at 50 Cent after he compared her BET look to an OWL... and claims he's mad because she turned down him down on a date: 'Let it go'


EXCLUSIVE Stayin' alive! Last surviving Bee Gees member Barry Gibb is seen in rare public outing running errands in Miami with wife of 51 years


Art critics don't hold back disdain for 'grumpy' Princess Diana memorial branded 'spiritless hunk of nonsense'

Baby gear that's fit for royalty: Why Nuna products would make the perfect gifts for the



© RHTY/starmaxinc.com/REX/Shutterstock

**The latest: Music mogul Damon Dash, 48, was arrested connection with $404,000 in unpaid child support to ex-wife Rachel Roy and ex-girlfriend Cindy Morales on Wednesday in his native New York. He was snapped last year in NYC**

Dash was released after he went to a Manhattan court and paid a debt of about $1 million for an outstanding warrant.

He was then taken into custody by seven deputies as he headed to handle his other warrant, he told **TMZ** Wednesday. He was then reportedly processed and transported to the Bronx Family Court to handle the outstanding remainder of his balance.

**SHARE THIS ARTICLE**

 Share

**129** shares

**RELATED ARTICLES**

< >

 **Kanye West SUES Jay-Z's former label Roc-A-Fella Records and...**

**Lee Daniels and Damon Dash settle long-running feud as...**

**'They're cowards': Damon Dash slams Beyonce and Jay-Z for...**

**'She's aware of how much harm they can cause': Rachel Roy...**

Dash told TMZ that the deputies were very understanding and cooperative in the process.

Officials had previously urged the music and fashion executive to turn himself into custody but he left New York, a police insider told Page Six.



rachel_roy ✓ • Follow
Burano, Italy

768 likes
rachel_roy The color of Burano, brights & stripes🦋🦋 RR in the Striped Linen Sundress 💓

**Family: Dash is father to daughters Ava, 19, and Tallulah, 11, with ex Rachel Roy, 45. They were snapped in Italy this past summer**

---

new royal baby
SPONSORED


Spotted at Wimbledon! Kate Middleton stuns in $1k Alessandra Rich skirt as she makes her first appearance of 2021 to watch Jamie Murray compete


Colton Underwood strips off! Bachelor alum shows off brooding new look in racy photoshoot displaying his ripped physique


Howard University students call for Bill Cosby's on-screen wife Phylicia Rashad to be FIRED from her post of dean after she celebrated conviction being overturned


Princess Diana's brother Charles Spencer says it was a 'good day' unveiling his sister's statue at Kensington Palace - as he shares two photos from the private event

Nicky Hilton wows in a pea print D&G sundress as she joins her parents Richard and Kathy for a sunny stroll and lavish lunch in Rome


Amazon shoppers are amazed at how well this Shark steam mop tackles ingrained dirt and grime without chemicals - and it's now reduced by $20
PROMOTED


Gossip Girl reboot creator says Ivanka and Jared will 'definitely NOT' be in new series because it 'represents where New York is now' - one decade after they made cameo in original


'I was doing nothing wrong': Taika Waititi breaks his silence on THAT three-way kiss with girlfriend Rita Ora and actress Tessa Thompson... after being 'reprimanded by Marvel bosses'


Lindsay Lohan turns 35! Mean Girls star celebrates at 'magical' birthday dinner with family and friends
She dined at The Maine restaurant in Dubai


'I miss the old me': Iskra Lawrence opens up about shifting relationship with her 'sexuality' while sharing throwback modeling snaps

The Walking Dead star Jeffrey Dean Morgan shared a sweet tribute to Hilarie Burton on her 39th birthday
The 55-year-old actor also shared a photo

Princes William and Harry's arrangements for unveiling of Princess Diana statue demonstrates 'new Spencer generation taking over without a Windsor in sight'

The Crown creator Peter Morgan will end the show after season six because the plot is too close to present day and recent events haven't had 'time to gain a proper perspective'

For ALL the showbiz news on the internet, go to Newzit.com

SPONSORED

Harry Potter star Jessie Cave reveals she was 'treated like a different species' after gaining weight and going from a size 4 to an 8 between films in her early 20s

Out and about: Dash was snapped in Burbank this past April



Big Apple beauties: Roy and daughter Ava were snapped in NYC in January

April Love Geary slips into wild bikini as she shows off her post-baby figure for 'Hot mom(bod) summer'

Harvey Weinstein's ex Georgina Chapman cozies up to boyfriend Adrien Brody as he is seen with her and the disgraced producer's kids India, 10, and Dashiell, 8, for first time

Rebel Wilson shows off slim physique in tight pink top and flared jeans as she celebrates wrapping on her new film Senior Year with fellow Australian actress Angourie Rice

Tammy Hembrow shows off her incredible sneaker closet as she poses in skimpy green lingerie
She's built a multimillion dollar fitness empire with her Instagram selfies

'I cherish family very much': Pierce Brosnan reflects on his struggle with not having a father figure when he was young and says it helped him 'value' his loved ones

Dash, who co-founded Roc-A-Fella Records along with Jay-Z, told the court last week he's got a 'virtually nonexistent' income, and was only surviving on money from a $2 million debt owed to him by Empire creator Lee Daniels following a recent court

settlement.

Dash took the more hands trapped for cash as he's expecting another child with fiancee, Raquel Horn.

Dash was married to fashion designer Roy, 45, from 2005 to 2009 and has two daughters with her - Ava, 19, and Tallulah, 11.

He's also father to son Damon Dash Jr., 27, with ex Linda Williams, and a son named Lucky with Morales.



Industry veteran: (L-R) Dash, Suge Knight, Snoop Dogg, the late Tupac Shakur and MC Hammer were snapped at a Grammy party in February of 1996

**Read more:**

Damon Dash Arrested for Unpaid Child Support

Roc-A-Fella records co-founder Damon Dash arrested

**Share or comment on this article: Damon Dash arrested as he's behind $400K in child support payments to Rachel Roy and Cindy Morales**

      

**129** shares



New Cadillac's Finally On Sale

All Things Auto | Search Ads

Sponsored Links

 

**1 would pick them over Birkenstocks I have ... these are ... these are comfy cork sandals are the perfect affordable alternative to pricey brands**
PROMOTED

**'I know I'm not everyone's cup of tea': Steve Irwin's 'hot niece' Rebecca Lobie strips down to a lace G-string and shows off her pert derrière as she prepares a warm beverage**

**Jennifer Garner, 49, spends quality mother-daughter time with the oldest of her three children, 15-year-old Violet in Paris**

**Inside Ben Simmons' $23million LA mansion: Aussie basketball star, 24, buys in Hidden Hills after pulling out of the Tokyo Olympics**
The Philadelphia 76ers star dated Kendall Jenner

**Kate Hudson, 42, showcases her honed physique in a pink sports bra and black leggings as she complete an intense workout outdoors**

ADVERTISEMENT

DailyMail.com

EXCLUSIVE **Katy Perry and Orlando Bloom share a steamy kiss in the water as they soak up the sun during romantic holiday in Turkey**

**One big happy family! Neil Patrick Harris enjoys a coastal walk with his husband and two kids as the filming of AGT is put on hold amid COVID-19**

**Well, they do call it the City of Love! Ciara puts on a leggy display in a pink Gucci T-shirt dress as she puckers up to husband Russell Wilson during VERY romantic boat ride in Venice**

**Amazon shoppers love these 'comfortable and breathable' Under Armour shorts for summer workouts - and they're now reduced by up to 20%**
PROMOTED

**In the driving seat! Queen, 95, gets behind the wheel of her Land Rover to return to Royal Windsor Horse Show after a busy week in Scotland**

**Charlene and Albert:**